## 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

### Norfolk and Western R. R. Co. v. Cottrell.

June 30th, 1887.

1. Practice at Common Law—*Process—Service—Corporation.*—Under Acts 1883–4, p. 701, providing for the service of process on corpora-- tions—

Held :

That service on any corporation, other than a bank of circulation, may be on any agent thereof in the county or corporation in which he resides, or in which the principal office of the company is located, whatever may be the employment of such agent.

2. Idem—*Instructions.*—Where an instruction assumes no fact, but states. the law correctly where a state of things made to depend upon the finding the jury may make from the evidence, it is not obnoxious to objection.

3. Master and Servant—*Risks of employment—Contributory negligence.* Servant takes upon himself all the risks and perils incident to the· employment, and if he receives an injury resulting from those risks and perils, or from his own negligence as the proximate cause, the· master is not liable.

4. Idem—*Case at bar.*—Plaintiff, employed as brakeman by defendant, had his hand crushed between the dead-blocks while coupling cars. He saw the cars were coming too fast for safe coupling and signalled them to stop ; he saw they did not stop ; but when they were near him he stepped in to make the coupling, and was hurt.

Held :

When he saw that none of his signals had been obeyed, it was his. duty to stay out, and it was negligence in him to go in between the cars. And his injury was *the immediate result of his own act.*

Error to judgment of the hustings court of the city of· Roanoke, rendered twenty-third June, 1886, in an action of·

trespass on the case for negligent injury, in which John Cottrell, by, &c., was plaintiff, and the Norfolk and Western Railroad Company was defendant. The jury found for the plaintiff, and assessed his damages at $6,000. The defendant moved to set aside the verdict as contrary to the law and the evidence. The court refused, the defendant excepted, and the evidence was certified. At the trial several instructions were given by the court on the plaintiff's motion, against the defendant's objection. The defendant again excepted, and obtained a writ of error and *supersedeas* to the judgment. Opinion states the case.

*Griffin & Watts*, for the plaintiff in error.

*Penn & Cocke* and *G. W. & L. C. Hansbrough*, for the defendant in error.

LACY, J., delivered the opinion of the court.

The case is as follows: John H. Cottrell, the defendant in error, was a brakeman on the road of the plaintiff in error in November, 1885, when, on the nineteenth of the said month, his hand was mashed off by being caught between two cars. The circumstances attending this accident were that, it being necessary to couple together some cars standing on the main track of the road and get them arranged and then moved out of the way of the regular trains on the road, one train being shortly due. An engineer named Jones was called, with his shifting engine already steamed up and ready for work, from a side track, and set about this business. The conductor of the shifting engine was present with his lantern (it being still in the night-time), and also the fireman, and the defendant in error, Cottrell, was on hand to do the coupling. There were then five stock cars among these standing cars men-

tioned above, there being some merchandise cars which divided the stock cars, three standing west of all the others, and two east of the merchandise cars, next to a gondola car, which was at the east end. The object in view was to put these stock cars together. The merchandise cars were first removed to a siding, when, the engine returning with the gondola and two stock cars, the conductor ordered Cottrell to couple the two stock cars to the three stock cars as the engine closed them up coming west, and he (the said conductor) assumed the duty of uncoupling the two from the gondola when the coupling had been made which fastened the stock cars together. The engine came on with the moving cars, the coupling was made by Cottrell, and the gondola uncoupled, or, as the phrase is, the cars were cut loose by the conductor. When Cottrell, coming close to the conductor, was asked, "How are you fixed?" (a phrase which is said to mean "Did you make the coupling or not?") Cottrell replied, "I am ruined," and held up his mashed hand, which was afterwards cut off by the surgeons, it being destroyed by the injury it had received. Cottrell sued the company and recovered a judgment for $6,000, from which the plaintiff in error applied for and obtained a writ of error to this court.

The first error assigned here is the refusal of the court below to dismiss the action on account of the insufficiency in the return of the sergeant upon the original process in the case. The return is that it was executed by delivering a copy to Charles G. Eddie, vice-president, at his office in the city of Roanoke, he being a resident of said city (the president being a non-resident, and absent, etc.); also by delivering a copy to Joseph H. Sands, general superintendent of the Norfolk & Western Railroad Company, in the city of Roanoke, Virginia (said Sands being a resident of said city), January 16, 1886.

Our statute (Acts 1883-84, p. 701) provides for service on

the president, or other chief officer; in his absence, on certain named officers, and if there are none such, or they are absent, then "on any agent thereof, or on any person declared by the laws of this state to be an agent of such corporation"; which act is as follows: "It shall be sufficient to serve any process against or notice to a corporation on its mayor, rector, president, or other chief officer, or in his absence from the county or corporation in which he resides, or in which is the principal office of the corporation against or to which the process or notice is, if it be a city or town, on the president of the council or board of trustees, or, in his absence, on the recorder, or any alderman or trustee; and if it be not a city or town, on the cashier or treasurer, and, if there be none such, or he be absent, on a member of the board of directors, trustees, or visitors. If the case be against a bank of circulation, and be in a county or corporation wherein the bank has a branch, service on the president or cashier of such branch bank shall be sufficient; and if the case be against some other corporation, whether incorporated by the laws of this State, or any other State or country, transacting business in this State, on any agent thereof, or any person declared by the laws of this State to be an agent of such corporation; and, if there be no such agent in the county or corporation, publication of a copy of the process or notice, as an order is published under the eleventh section of this chapter, shall together be sufficient. Service on any person under this section shall be in the county or corporation in which he resides, or in which the principal office of the company is located; and the return shall show this, and state on whom and when the service was, otherwise the service shall not be valid."

The defendant in this case was a railroad company, not a town nor a bank. The president was a non-resident, and absent. The vice-president was not the president, nor was

he any other person who was chief officer of this company. The chief officer in this case is the president. But the return does not stop with evidence of service of a copy on this officer. It proceeds, " to Jos. H. Sands, general superintendent," etc. He is not the chief officer of the company; but does he not come within the general terms of the statute which provides for service " on any agent of the corporation," and do not these words include the vice-president as well? If such be not the chief officer, they are agents of the company. But it is earnestly argued that it must appear that these officers, in the order named in the statute, are either not in existence,—that is, that there are none such,—or that they are absent, before any one named in the statute subsequently can be made available. For example, if the president or other chief officer is not absent, then there is no authority in the law to serve on the cashier; and, if the cashier be not absent, then there is no authority to serve on the treasurer; and that without the absence of all these, there can be no valid service on the members of the board of directors; and unless these are all absent, or not existing, the service on an agent is not authorized.

Whatever may be the force of this reasoning as to a city or town, or bank of circulation, the law provides, after naming these, as we have seen, " and if the case be against some other corporation, whether incorporated by the laws of this State, or any other State or country, transacting business in this State, on any agent thereof;" and, further, as if to exclude the argument that such and such an officer was not what the company called an agent, it provides, " or any person declared by the laws of this State to be an agent of such corporation."

While this statute appears to be cumbrous in style, and somewhat involved, it should not be so construed as to render its provisions inoperative, but so as to render the

legislative intent effectual.   It is obvious from the terms
of the statute that the intent of the legislature was to pro-
vide a method by which it would be no longer difficult to
properly execute the process of the courts upon the corpo-
rations in the State; so we find the most general terms
employed—"any agent."   The term "agent" is one of very
wide application, and includes a great many classes of per-
sons to which distinctive appellations are given—as factors,
brokers, attorneys, cashiers of banks, clerks, consignees,
etc.; indeed, anyone who undertakes to transact some busi-
ness, or to manage some affair, for another, by authority
and on account of the latter, and to render an account of
it, is denominated an agent.   And it was the plain legis-
lative intent to smooth away the very obstructions which
are sought to be interposed here between this company
and responsibility sought to be imposed upon it by this
suit.

We have been thus explicit in the examination and con-
struction of this statute because it must be recognized as
of importance that this statute shall be understood by all;
and we think it is plain that the writ may be served on
"any agent" of a corporation doing business in this State,
and such service is valid, whoever may be the officers of
such company, and whatever may be their several employ-
ments: provided, as the law provides, "service on any
person under this section shall be in the county or corpo-
ration in which he resides, or in which the principal office
of the company is located; and the return shall show this,
and state on whom and when the service was, otherwise
the service shall not be valid."   And we think the hust-
ings court of Roanoke city did not err in overruling the
motion to dismiss the action on this ground.

The next assignment of error is the action of the court
in overruling the demurrer of the defendant to the declara-
tion.   Upon this assignment no reliance was placed in the

·argument by counsel in this court, and we perceive no error in that action of the court.

The next assignment of error is the refusal of the court to give certain instructions, ten in number, which the court changed in some respects, gave No. 4 and No. 6 in his own handwriting, and instructed the jury in nine instructions. No objection is urged in the argument here to any of these instructions except the eighth. This is claimed to be fatally bad; that it should have been divided, and that it proceeds upon the assumption that the defendant in error did not perceive that his signals had not been obeyed just before going in between the cars, and that it concludes with the assumption that the cars were run back in such a violent and rapid manner as to confuse and frighten the defendant in error. The instruction is not obnoxious to either of these objections. There is no assumption of fact to be found in either branch of the instruction; but the law is stated, and correctly stated, upon a state of things in each case made to depend upon the finding the jury should make from the evidence. The court says: "But if the jury shall believe from the evidence that the plaintiff made the signal to stop in proper time for the train to be stopped or reduced to a safe speed at the moment of coupling," etc.; and, in the last clause, "and if they further believe that, on account of the want of care on the part of the person having the management and control of the train, the defendant's cars were run together in such a violent and rapid manner as to confuse and frighten the plaintiff," etc. There is no assumption of anything as existing as a proved fact. The existence of every fact is properly left to depend upon the finding of the jury from the evidence. We think there is no error in this instruction, and the same must be said of them all. They correctly expound the law as applicable to this case, and there is no error in this action of the court.

The next assignment of error is for the refusal of the

court to set aside the verdict of the jury in the case, and to grant a new trial to the defendant. The evidence in the case shows that the plaintiff was an employee of the defendant company; that he was employed as a brakeman, and for the work of coupling cars about which he was engaged; that, while he was a minor, he was a full-grown man, and was in the habit of finding employment himself; that he had been in the employment of the company less than three days; and that he had promised to bring his father's consent, or saying what was equivalent to that—his father being cognizant of his employment, and seeing him daily. The risk incident to coupling cars was assumed when the service was undertaken. Nothing is better settled than that the employee takes upon himself all the natural risks and perils incident to the service; and this grows out of the contract which the law implies from the engagement of the parties.

When a servant enters upon an employment, he accepts the service subject to the risks incident to it. An employee who contracts for the performance of hazardous duties assumes such risks as an incident to their discharge from causes open and obvious, the dangerous character of which causes he had opportunity to ascertain. If a man chooses to accept employment, or continue in it, with the knowledge of the danger, he must abide the consequences so far as any claim against his employer is concerned. It is the duty of the company to exercise all reasonable care, to provide and maintain safe, sound, and suitable machinery, roadway, structures, and instrumentalities; and it must not expose its employees to risks beyond those which are incident to the employment, and were in contemplation at the time of the contract of service; and the employee has the right to presume these duties have been performed.

As has been stated, the accident in this case occurred when the defendant in error was engaged in coupling cars.

After the conductor threw the switch which connected the main track between the two sections of the train or parcels of cars, he signaled the engineer to go ahead. He told the defendant in error to hurry up, that the expected train from the west was nearly due, and he wanted to get these cars off of the main line. The defendant in error says "the engineer came ahead according to the signal until about a car length or more from me, and I saw he was coming too fast for me to make the coupling, and I gave him a signal to steady up. When he came nearer, about twelve feet from me, I shut him off entirely"; that the engineer did not steady up, and did not stop; that the engineer was not in sight, but the conductor was in sight of both, and it was his duty to pass the signal; that he does not know whether the conductor passed the signal on or not, but that neither of these signals were obeyed; that when the moving train which was coming at this speed, too great to make the coupling, was near the standing cars, he stepped in between the cars, and as the train came up he caught hold of the link of the moving train with his left hand, and placed it in the draw-head of the standing car, and the train came together so violently that his hand was caught between the dead-blocks, and was mashed; that he sprang out then, and saw the conductor come from between the two stock cars and the gondola, where he had been to cut them loose; that the train never ceased to move, although it may have ceased a little after it struck the three cars that were standing,—the only stopping was caused by the concussion with the three standing cars; that he was six feet high, and that standing by the cars that night the dead-blocks came about to his waist, and that these cars were standard cars, and that he knew their shape and construction, having been engaged in work upon their manufacture, and that they were made in the shops at Roanoke city.

It was proved in the case that the dead-blocks were bumpers placed on these cars, and all others, expressly to receive the concussion and the shock when moving cars came in contact with stationary cars, and that the draw-heads into which the coupling was fastened were so constructed as to yield to pressure, and give on a spring when the cars came together, so as to leave the shock of the collision, whatever it might be, to the dead-blocks, which were so constructed as to receive this inevitable shock without injury; that while it was possible to so make a coupling without bringing the dead-blocks into collision, yet that it was in fact, in practice, substantially impracticable; that it could only be done by stopping the moving cars after the impingement of the draw-heads within an inch or two; and it is proved that if the hand of this defendant in error had not been placed between these dead-blocks it would not have been hurt, while, if placed between them, it was obliged to be hurt, whether the cars were moving very slowly or too fast. The dead-blocks are constructed on the frame of the car above the draw-heads, which are below, and attached to the trucks.

The right of the plaintiff to recover in this case is dependent on the question whether the defendant was guilty of negligence. If the injury was caused solely by the negligence of the defendant, there can be no doubt of the plaintiff's right to recover damages for the injury; but if there was negligence on the part of the plaintiff which contributed to the injury, the law will not undertake to apportion the fault. There can be no recovery for an injury caused by the mutual fault of both parties. The mere negligence of the plaintiff, however, would not disentitle him to recover, unless it were such that but for that negligence the misfortune would not have happened; nor if the defendant might, by the exercise of care on his part, have avoided the consequences of the plaintiff's

negligence. *Dun* v. *Seaboard & Roanoke R. R. Co.,* 78 Va. 661, and case cited; *Clark* v. *Richmond & Danville R. R.,* Id. 709, and cited cases; *Darracott* v. *Chesapeake & Ohio R. R., ante,* p. 288, and cases there cited.

If the cars were moving at too great a rate of speed, and the plaintiff could see it and knew it, as he said he did, it was negligence in him to go between the cars to make the coupling; and if they were not moving at too great a rate of speed, then the company was guilty of no negligence, and the plaintiff cannot recover damages for the injury. But it is a concession that the cars were not moving at too great a rate of speed; and it is proved that they came to a stand still when they came together, and the conductor stepped in and uncoupled them without difficulty. But it is insisted that the plaintiff signaled the cars to stop, and they failed to do this, and that this was negligence. He, the plaintiff, says that when the train was within ten or twelve feet of him he saw it was coming too fast, and he signaled to stop it; that it did not stop, and, when near to him, he stepped in to make the coupling, and was hurt. If he saw that none of his signals had been obeyed, it was his duty to stay out, and it was negligence for him to go in between the cars.

But it is clear in this case that the defendant company was guilty of no negligence whatever. The cars were of standard make, without defect; the speed was suitable and proper; the servants employed were trustworthy, and the accident which resulted in the injury was the immediate result of the plaintiff's own act in putting his hand awkwardly between the dead-blocks. These blocks are, as their name indicates, dangerous. They are to be avoided in all couplings, and are upon all cars. They are not in a line with nor in close proximity to the draw-heads, but they are on each side and above the draw-heads, and, while they are dangerous in themselves, they are necessary to preserve

the life of the brakeman by protecting his body from the cars, and they are a necessary precaution against danger. They are open, obvious and notorious, and all brakemen understand, doubtless, that they must keep their hands from between them, for if they were to touch ever so gently the touch would crush all that came between. The plaintiff distinctly admits that he knew the situation of these dead-blocks; that their situation, use, and the danger surrounding them were known to him is clearly proved. He had been engaged as a mechanic in their manufacture in the shops close by. The risk incurred by him was the same,—no greater than that incurred by all who undertake to couple these cars. The risk was ordinarily incident to his employment, and he was injured because he failed to take ordinary care in the premises.

As was said by Green, J., *Northern Central Ry. Co.* v. *Husson*, 12 Amer. & Eng. R. Cas. 241 : "It is not claimed that there was any defect in the road-bed, or the cars, or in the coupling apparatus. The injury was not the result of any defect in any of the appliances furnished by the defendant. On the contrary, it was the result of the manner in which the coupling was performed." This coupling, under similar circumstances, is done every day with perfect safety when properly done, while, as we have already said, there are no circumstances under which the coupling could be performed, and the hand thrust between the dead-blocks, with safety. "It is manifestly apparent from the entire body of the testimony, as from the plaintiff's alone, that the risk under consideration was one of the ordinary risks of the business in which the defendant in error was engaged, and hence there is no liability resulting from it." See also *Patterson* v. *Pittsburg & C. R. R. Co.*, 20 P. F. Smith, p. 293 ; *Pittsburgh & C. R. R. Co.* v. *Sentmeyer*, 11 Norris, 276 ; *Baker* v. *Allegheny Val. R. R. Co.*, 14 Norris, 211 ; *Day* v. *Toledo, C. S. & D. R. R. Co.*,

42 Mich. 523; *Atchison, T. & S. F. Ry. Co.* v. *Plunkett,* 2 Amer. & Eng. R. R. Cas. 128; *Columbus & X. R. R.* v. *Webb* (opinion of Sutliff, C. J.), 12 Ohio St. 475; *Sweeney* v. *Berlin & J. E. Co.,* 101 N. Y. 520, 524; Patterson R. R. Accident Law, 345, and cases cited; Whart. Neg. 391; Thomp. Neg. 1019; *Marsh* v. *South Carolina Ry. Co.,* 56 Ga. 274–277.

In this case the company, the plaintiff in error, appears to be entirely without fault in the matter, and there was no just ground upon which the finding of the jury could be sustained. We are therefore of opinion that the hustings court of Roanoke city erred in its action in refusing to set aside the verdict of the jury, and for that action the judgment in this case will be reversed and annulled; and the case remanded to the said hustings court of Roanoke city for a new trial to be had therein.

Judgment reversed.