Whitcomb *v.* Standard Oil Co.

---

WHITCOMB *v.* STANDARD OIL COMPANY.

[No. 18,667. Filed November 28, 1899.]

MASTER AND SERVANT.—*Negligence.—Assumption of Risk.—Employers' Liability Act.—Contributory Negligence.—Statutes.*—The repeal of section two of the employers' liability act of 1893 (Acts 1893 p. 294), by the General Assembly of 1895 (Acts 1895 p. 148), will not be accepted as evidence of legislative intent that the remaining section should be construed as overthrowing the common law doctrine of assumed risks so far as to charge the master with the assumption of all risks from defective machinery and appliances while the servant is engaged in performing acts under the direction of a superior. *pp. 515-517.*

SAME.—*Employers' Liability Act.—Contributory Negligence.*—The employers' liability act of 1893, §7083 Burns 1894, making a railroad company liable for damages for personal injuries suffered by an employe in its service while in the exercise of due care and diligence, when such injury is suffered by reason of any defect in the

153 513
158 613

153 513
159 151

153 513
e161 679

153 513
164 541

153 513
168 227

condition of appliances in use by the corporation, or by reason of the negligence of any person in the service of such corporation to whose order or direction the injured employe at the time of the injury was bound to conform, and did conform, does not relieve the emplóye from that caution and care of himself required by the common law. *pp. 517-521.*

From the Porter Circuit Court. *Affirmed.*

*W. Olds* and *C. F. Griffin*, for appellant.

*A. D. Eddy*, for appellee.

HADLEY, C. J.—The appellant sued the appellee for damages for the loss of his hand while in the employ of appellee engaged in attempting to couple cars.

The complaint filed in May, 1897, alleges that at the time of the grievance complained of, appellee, in connection with its oil plant in Lake county, Indiana, operated a railroad, and handled all sorts of freight cars which it received from and sent out over its own and other railroads; that it conducted its business in an unusually negligent and extra hazardous manner in this—that it controlled, used, and operated in a negligent manner a large number of cars of various styles and kinds; that some of them were of defective construction and out of repair; that some of them were negligently constructed, with the body of the car and the draw-bars and couplings of various heights, and some so constructed with jams or buffers on either side of the draw-bars, some parallel with, and some extending above the draw-bars, which rendered the coupling of the cars more difficult and dangerous, and is a style of cars and a system of coupling abandoned and no longer in use by well regulated railroads; that appellant had no notice or knowledge of the kinds of couplings he would be called upon to make, and had not been notified of the hazardous character of the coupling; that on the 10th day of April, 1897, the plaintiff, by and under the direction of the head switchman or yard foreman in charge of making up trains and coupling of cars, and while in the line of duty, and without negligence, attempted to couple two

cars, one of them which had been negligently cut loose and kicked onto the switch at a high and dangerous rate of speed, and negligently allowed to run of its own momentum up to and against a standing car upon defendant's said switch, and, not having been notified by the defendant or informed, the plaintiff did not know whether the couplings, links and pins in the cars to be coupled were in good repair or defective, or whether the draw-bars and couplings on the cars were uniform or otherwise; that one of the draw-bars had a dog in it and the other did not, and the draw-bar on one of the cars had a link and pin in it that was defective and crooked so that it could not be removed without appliances, and was negligently suffered by defendant to remain bent and defective; that there were buffers on either side of the draw-bars extending above that came together in making a coupling, of which the plaintiff had no previous notice or knowledge; that, as he advanced to make the coupling, using due care, he observed that the draw-bar in the stationary car had a dog in it to hold the link horizontal, and that the moving car had a link in it but no dog; that he endeavored to remove the link from the moving car to place it in the other, but found it fast by reason of being bent, or too large, and, to accomplish the coupling as the link entered the draw-bar of the other car, he attempted to tip the pin into the link, and not observing the buffers, and while his hand was elevated, the buffers came together, caught and crushed his hand.

There was no demurrer to the complaint and the case went to the jury upon the general denial; and, at the close of appellant's evidence, upon motion of appellee, the court directed the jury to return their verdict for the defendant.

The only error assigned is upon the overruling of appellant's motion for a new trial, and the only question propounded thereunder involves the construction of two provisions of the act of March 4, 1893, (Acts 1893, p. 294). commonly known as the employers' liability act. It is af-

firmed that, since by the act of March 7, 1895 (Acts 1895, p. 148), repealing §2 of the act of 1893 (being §7084 Burns 1894), the remaining section, to wit, 7083 Burns 1894, should receive a broader construction than was justifiable while the two original sections stood together, the contention being that the repeal of §7084 should be accepted as evidence of legislative intent, that the remaining §7083 should be construed as overthrowing the common law doctrine of assumed risks, so far as to charge the master with the assumption of all risks from defective machinery and appliances while the servant is engaged in performing acts under the direction of a superior, though the injured servant saw and knew the nature and extent of the peril, or might have done so by the exercise of reasonable care.

The statute and the two specifications thereunder brought under review are as follows: "§1. That every railroad or other corporation, except municipal, operating in this state, shall be liable for damages for personal injury suffered by any employe while in its service, the employe so injured being in the exercise of due care and diligence, in the following cases: (1) When such injury is suffered by reason of any defect in the condition of ways, works, plant, tools and machinery, connected with or in use in the business of such corporation, when such defect was the result of negligence on the part of the corporation or some person entrusted by it with the duty or keeping such ways, works, plant, tools or machinery in proper condition. (2) Where such injury resulted from the negligence of any person in the service of such corporation, to whose order or direction the injured employe at the time of the injury was bound to conform, and did conform."

We know of no warrant for this court to accept the intention of the Assembly of 1895 as controlling the construction of a statute passed by the Assembly of 1893, especially where we are required to determine that intention by implication, and we must, therefore, confine ourselves to ap-

proved rules of construction and look rather to the intent of the legislature that gave the statute origin, if there is anything obscure in its provisions. But there is nothing obscure in the provisions before us, and nothing in them to justify the contention that the employe is thereby relieved from that caution and care of himself required by the common law. There are no express words to authorize such construction, and a principle of the common law so long established and universally approved can not be subverted by implication. The construction contended for would constitute a railroad company the absolute insurer of the safety of its employes against the ordinary and usual perils incident to the unexpected and excusable impairment of its ways, works, etc.; and thus to invest the employe with the sense of indemnity would in large measure strike down that salutary principle of public policy which requires everyone in every situation to be alert in the preservation of life and limb.

We held in *Louisville, etc., R. Co.* v. *Wagner, ante*, 420, that the second specification created a new liability, but we perceive nothing in the provision before us that modifies or restricts the rule concerning the assumption of risks as it existed prior to the passage of the act.

To sustain his appeal appellant must produce some evidence fairly tending to prove, under the first specification or clause of the statute, each of the following elements: (1) That he was in the observance of due care and diligence at the time of the injury. (2) That he was injured by a defect in the condition of the cars or their appliances. (3) That such defect was the result of appellee's negligence. (4) That he was damaged. Or, under the second specification, he must produce like evidence to support each of the following elements: (1) That he was without fault. (2) That he was injured while conforming to the orders of a person in the employ of appellee to whose orders he was bound to conform. (3) That his injury was caused by

the negligence of the person to whose orders he was bound to conform and was conforming at the time of the injury. (4) That he suffered damages.

And these elements of the right of action of the two several specifications must concur and be established, or there can be no recovery. Hence, if all the evidence produced, construed most favorably to appellant and aided by all reasonable inferences, fails to establish one of the essential elements, under each of the specifications, the judgment must be affirmed. *Day* v. *Cleveland, etc., R. Co.*, 137 Ind. 206, 210; *Weis* v. *City of Madison*, 75 Ind. 241, 39 Am. Rep. 135; *Faris* v. *Hoberg*, 134 Ind. 269; *Ohio, etc., R. Co.* v. *Dunn*, 138 Ind. 18; *Oleson* v. *Lake Shore, etc., R. Co.*, 143 Ind. 405, 409, 32 L. R. A. 149.

It does not constitute negligence for a railroad company, in the ordinary course of business, to receive into its switch yards from other roads cars in general use differing in construction and switching devices which may not be of the most approved patterns; and the switching and coupling of such cars and the shifting and setting them into trains is one of the risks assumed by the employe in undertaking the employment. Bailey's Personal Injuries, §2554; *Louisville, etc., R. Co.* v. *Bates*, 146 Ind. 564, 570; *Baldwin* v. *Chicago, etc., R. Co.*, 50 Iowa, 680; *Michigan Central R. Co.* v. *Smithson*, 45 Mich. 212, 7 N. W. 791; *Indianapolis, etc., Co.* v. *Flannigan*, 77 Ill. 365. And it is not negligence on the part of a railroad company to fail to warn an inexperienced employe of the greater danger incident to coupling cars that are supplied with deadwoods or buffers than cars having an ordinary device. Such increased danger is obvious and incident to the service. *Louisville, etc., R. Co.* v. *Boland*, 96 Ala. 626, 11 South. 667, 18 L. R. A. 260; *Norfolk, etc., R. Co.* v. *Cottrell*, 83 Va. 512, 3 S. E. 123; *East Tennessee, etc., R. Co.* v. *Turvaville*, 97 Ala. 122, 12 South. 63. Furthermore, if an employe fails to fully apprehend the extent of peril from a known defect, but

voluntarily encounters it and attempts an act rendered hazardous by the defect, he assumes the risk. *Louisville, etc., R. Co.* v. *Kemper*, 147 Ind. 561; *Umback* v. *Lake Shore, etc., R. Co.*, 83 Ind. 191; *Reitman* v. *Stolte*, 120 Ind. 314; *Ames, Adm.*, v. *Lake Shore, etc., R. Co.*, 135 Ind. 363.

From the testimony of appellant it appears that he was twenty-six years of age. Prior to his injury he had had one year's experience in railroading, three months as switchman and nine months as brakeman. He entered the service of appellee five days before his injury, and during the time he had been engaged in coupling cars in the yard wherever they should be thrown or set for distribution to divers roads; hundreds of cars belonging to various roads were handled every day. The cars differed in construction in many ways. There were different kinds of draw-bars; some automatic, some with spring dogs, some without; some without buffers, some with buffers; and some with buffers set above the draw-bar, some below and some on a level. The spring dog in a draw-bar, would hold the link out horizontally, so that it would enter the draw-head of another car of like construction, and the spring dog of the other car would throw the pin into the link and thus accomplish the coupling automatically. Those without the spring dog were coupled with a link and pin by hand. A car with automatic device had to be frequently coupled with a car having the ordinary link and pin. On the day before he went to work, guided by his uncle, who was an employe, appellant inspected the switch yard and noticed six or seven different kinds of draw-bars. He had never coupled cars with buffers or deadwoods before coming to Whiting. Witness had observed a car standing by itself on a track near where he was working. He went to it and placed a pin in it and then observed that it had a spring dog in the draw-head, but no link. He saw a cut of three cars approaching the standing car upon the same track, and, assuming that it was for the purpose of picking up the standing car, he went to the front of the ap-

proaching cars, which were running about three miles an hour, "in a very slow walk". They were about four car lengths from the standing car when he reached them, and seeing that the front car had a link and pin but no spring dog in it, he decided to change the link from that to the standing car with the dog in it, as the easiest and safest way to make the coupling; and, walking in front of the advancing cars, he endeavored to remove the link but found it fast by reason of the pin being bent, or too large, and, failing to get the pin out, as they neared the standing car, he decided to attempt the coupling anyhow, and, raising the link with his hand to a horizontal position, guided it into the drawhead of the standing car, expecting that, as soon as the link pressed back the spring, he would drop the pin into the link before the dog cast it out again. And, his attention being centered upon the act of coupling, he thoughtlessly raised his hand to direct the pin, and the deadwoods or buffers of the cars coming together caught and crushed it. Both cars were of like construction and both had deadwoods about eight inches square and a foot long extending above and the length of the draw-bars.

"Q. Now when you walked up there with this car there was nothing to prevent your seeing that both of them had deadwoods? A. No sir. Q. You could see both cars perfectly? A. Yes sir. Q. And see the deadwoods perfectly? A. Yes sir. Q. So if you had kept your hand under the link, the deadwood would not have struck it? A. I would have run my hand under the draft iron. Q. You took it out of there? A. Yes sir. Q. And raised it up so that it caught in the deadwood? A. Yes sir. Q. If you had drawn it straight towards you it would not have caught in the deadwoods? A. No. Q. What did you raise it up for? A. Because in coupling on the North West road it is natural for a man to raise his hand above the pin where he thinks the pin won't jar down or the cars will bound back. Q. Could you notice if you raised your hand up it

would come between the bumpers? A. If I had been look-ing at the bumpers. Q. If you had looked you could have seen them? A. Yes. Q. If your attention had been given to the deadwoods you could have kept your hand out? A. Yes sir. Q. Who, if any one told you to make that coupling at that time? A. That is my business. Q. How did you know it was your business? Did anyone es-pecially tell you to make the coupling of that car? A. No. Q. You did it of your own motion? A. Yes. Q. If you did not make that coupling it was simply to save you from walking? A. Yes, to save walking. Q. Who gave you directions as to coupling of cars or as to what cars to couple? A. Dave Parmelee [yard foreman]. Q. What direction did he give you as to coupling cars? A. He didn't give me any, only I was to work in the field, get them from the field."

From these answers it is perfectly clear that appellant's injury flowed from an ordinary danger incident to the busi-ness in which he was engaged and which might have been avoided by the exercise of due care. It follows therefore that appellant had not made out his case, and the court did right in directing the verdict for appellee. Judgment af-firmed.