JOHNSON v. SOUTHERN PAC. CO.

(Circuit Court of Appeals, Eighth Circuit. August 28, 1902.)

No. 1,722.

1. AUTOMATIC COUPLERS—ACT OF MARCH 2, 1893, DOES NOT REQUIRE LOCOMOTIVES TO BE EQUIPPED WITH.

The act of March 2, 1893 (27 Stat. c. 196, p. 531), does not make it unlawful for common carriers to use locomotives engaged in interstate commerce which are not equipped with automatic couplers.

2. CONSTRUCTION OF STATUTES—ACT CHANGING COMMON LAW STRICTLY CONSTRUED.

A statute changing the common law modifies or abrogates it no farther than the clear import of its language necessarily requires.

3. SAME—PENAL STATUTE STRICTLY CONSTRUED.

A penal statute may not be so broadened by construction as to make it cover, and authorize the punishment of, otherwise lawful acts, which are not denounced by the usual meaning of its express terms.

4. SAME—ENUMERATION OF SUBJECTS EXCLUDES OTHERS.

A statute which enumerates the parties, things, or acts which it denounces thereby impliedly excludes all others from its effect.

5. SAME—WHEN NOT PERMISSIBLE.

When the language of a statute is unambiguous, and its meaning is plain, it must be held to mean, and the legislative body must be held to have intended, what it plainly expresses, and no room is left for construction.

6. INJURY TO SERVANT—NEGLIGENCE—ASSUMPTION OF RISK.

A servant assumes the ordinary risks and dangers of the employment upon which he enters, so far as they are known to him, and so far as they would have been known to one of his experience, age, and capacity by the use of ordinary care.

7. SAME—ASSUMPTION OF RISK OF COUPLING CARS WITH DIFFERENT COUPLERS.

A brakeman of ordinary intelligence and experience assumes the risks and dangers of coupling cars provided with different kinds of well-known couplers, bumpers, and deadwoods, because these are the ordinary risks and dangers of his service.

8. SAME—AUTOMATIC COUPLERS—ACT OF MARCH 2, 1893—EQUIPMENT OF CAR WITH ONE KIND OF COUPLER SUFFICIENT.

The equipment, under the act of March 2, 1893, of a car with automatic couplers which will couple automatically with those of the same kind or make, is a compliance with the statute. It does not require cars used in interstate commerce to be equipped with couplers which will couple automatically with cars equipped with automatic couplers of other makes.

9. SAME—WHEN CAR IS USED IN MOVING INTERSTATE TRAFFIC.

Cars loaded with articles shipped to other states, and started, whether in yards, on side tracks, or in trains, are used in moving interstate traffic. But vacant cars in yards, on side tracks, in repair shops, or in trains which are not loaded with, or in use to move articles of, interstate commerce, do not fall within the terms or meaning of the act of March 2, 1893. A dining car standing empty on a side track at an intermediate station, where it had been left by a train engaged in interstate traffic until it should be taken by another train engaged in the same traffic, going in the opposite direction, and which the owner intended to use in interstate traffic was drawn by a freight engine from the side track to the turntable, turned, and placed again upon the side track. *Held*, that

---

¶ 6. See Master and Servant, vol. 34, Cent. Dig. § 554.

the car was not used in moving interstate traffic while it was on the side track and while it was being turned.

Thayer, J., dissenting in part.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of Utah.

This is an action for damages for a personal injury, in which the court instructed the jury to return a verdict for the defendant upon this state of facts: The defendant was operating passenger trains between San Francisco, in the state of California, and Ogden, in the state of Utah. It was in the habit of drawing a dining car in these trains. Such a car formed a part of a train leaving San Francisco, and ran through to Ogden, where it was ordinarily turned and put into a train going west to San Francisco. On August 5, 1900, the east-bound train was so late that it was not practicable to get the dining car into Ogden in time to place it in the next west-bound train, and it was therefore left on a side track at Promontory, in the state of Utah, to be picked up by the west-bound train when it arrived. While it was standing on this track the conductor of a freight train which arrived there was directed to take this dining car to a turntable, turn it, and place it back upon the side track, so that it would be ready to return to San Francisco. The conductor instructed his crew to carry out this direction. The plaintiff, Johnson, was the head brakeman, and he undertook to couple the engine to the dining car for the purpose of carrying out the order of the conductor. The freight engine was equipped with a Janney coupler, which would couple automatically with another Janney coupler, and the dining car was provided with a Miller hook or Miller coupler, which would couple automatically with another Miller hook; but the Miller hook would not couple automatically with the Janney coupler, because it was on the same side, and would pass over it. Johnson knew this, and undertook to make the coupling by means of a link and pin. He knew that it was a difficult coupling to make, and that it was necessary to go between the engine and the car to accomplish it, and that it was dangerous to do so. Nevertheless he went in between the engine and the car, and tried to make the coupling three times, without objection or protest. He failed twice, and the third time his hand was caught and crushed so that it became necessary to amputate his arm above the wrist.

W. L. Maginnis, for plaintiff in error.

Henry G. Herbel (Martin L. Clardy, on the brief), for defendant in error.

Before SANBORN and THAYER, Circuit Judges, and LOCH-REN, District Judge.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

Under the common law the plaintiff assumed the risks and dangers of the coupling which he endeavored to make, and for that reason he is estopped from recovering the damages which resulted from his undertaking. He was an intelligent and experienced brakeman, familiar with the couplers he sought to join, and with their condition, and well aware of the difficulty and danger of his undertaking, so that he falls far within the familiar rules that the servant assumes the ordinary risks and dangers of the employment upon which he enters, so far as they are known to him, and so far as they would have been known to one of his age, experience, and capacity by the use of ordinary care, and that the risks and dangers of coupling cars provided with different kinds of well-known couplers, bumpers, brake-

heads, and deadwoods are the ordinary risks and dangers of a brakeman's service. Manufacturing Co. v. Erickson, 55 Fed. 943, 946, 5 C. C. A. 341, 343; Railroad Co. v. Blake, 27 U. S. App. 190, 194, 11 C. C. A. 93, 95, 63 Fed. 45, 47; King v. Morgan, 48 C. C. A. 507, 511, 109 Fed. 446, 450; Gold Mines v. Hopkins, 111 Fed. 298, 304, 49 C. C. A. 347, 353; Railroad Co. v. McDade, 135 U. S. 554, 570, 10 Sup. Ct. 1044, 34 L. Ed. 235; Railroad Co. v. Seley, 152 U. S. 145, 152, 14 Sup. Ct. 530, 38 L. Ed. 391; Kohn v. McNulta, 147 U. S. 238, 241, 13 Sup. Ct. 298, 37 L. Ed. 150; Railroad Co. v. Voight, 176 U. S. 498, 120 Sup. Ct. 385, 44 L. Ed. 560; Sweeney v. Envelope Co., 101 N. Y. 520, 5 N. E. 358, 54 Am. St. Rep. 722; Railway Co. v. Smithson, 45 Mich. 212, 7 N. W. 791; Hodges v. Kimball, 44 C. C. A. 193, 104 Fed. 745; Whitcomb v. Oil Co. (Ind. Sup.) 55 N. E. 440, 442; Boland v. Railroad Co. (Ala.) 18 South. 99.

This proposition is not seriously challenged, but counsel base their claim for a reversal of the judgment below upon the position that the plaintiff was relieved of this assumption of risk, and of its consequences, by the provisions of the act of congress of March 2, 1893 (27 Stat. c. 196, p. 531). The title of that act, and the parts of it that are material to the consideration of this contention, are these:

"An act to promote the safety of employés and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes and their locomotives with driving wheel brakes and for other purposes.

"Section 1. That from and after the first day of January, 1898, it shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving wheel brake and appliances for operating the train brake system. * * *

"Sec. 2. That on and after the first day of January, 1898, it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

"Sec. 6. That any such common carrier using any locomotive engine, running any train, or hauling or permitting to be hauled or used on its line any car in violation of any of the provisions of this act shall be liable to a penalty of one hundred dollars for each and every such violation. * * * *"

"Sec. 8. That any employé of any such common carrier who may be injured by any locomotive, car or train in use contrary to the provisions of this act shall not be deemed thereby to have assumed the risk thereby occasioned, although continuing in the employment of such carrier after the unlawful use of such locomotive, car or train had been brought to his knowledge."

The first thought that suggests itself to the mind upon a perusal of this law, and a comparison of it with the facts of this case, is that this statute has no application here, because both the dining car and the engine were equipped as this act directs. The car was equipped with Miller couplers which would couple automatically with couplers of the same construction upon cars in the train in which it was used to carry on interstate commerce, and the engine was equipped with a power driving wheel brake such as this statute prescribes. To overcome this difficulty, counsel for the plaintiff persuasively argues that this is a remedial statute; that laws for the prevention of fraud, the

suppression of a public wrong, and the bestowal of a public good are remedial in their nature, and should be liberally construed, to prevent the mischief and to advance the remedy, notwithstanding the fact that they may impose a penalty for their violation; and that this statute should be so construed as to forbid the use of a locomotive as well as a car which is not equipped with an automatic coupler. In support of this contention he cites Suth. St. Const. § 360; Wall v. Platt, 169 Mass. 398, 48 N. E. 270; Taylor v. U. S., 3 How. 197, 11 L. Ed. 559; and other cases of like character. The general propositions which counsel quote may be found in the opinions in these cases, and in some of them they were applied to the particular facts which those actions presented. But the interpolation in this act of congress by construction of an ex post facto provision that it is, and ever since January 1, 1898, has been, unlawful for any common carrier to use any engine in interstate traffic that is or was not equipped with couplers coupling automatically, and that any carrier that has used or shall use an engine not so equipped has been and shall be liable to a penalty of $100 for every violation of this provision, is too abhorrent to the sense of justice and fairness, too rank and radical a piece of judicial legislation, and in violation of too many established and salutary rules of construction, to commend itself to the judicial reason or conscience. The primary rule for the interpretation of a statute or a contract is to ascertain, if possible, and enforce, the intention which the legislative body that enacted the law, or the parties who made the agreement, have expressed therein. But it is the intention expressed in the law or contract, and that only, that the courts may give effect to. They cannot lawfully assume or presume secret purposes that are not indicated or expressed by the statute itself and then enact provisions to accomplish these supposed intentions. While ambiguous terms and doubtful expressions may be interpreted to carry out the intention of a legislative body which a statute fairly evidences, a secret intention cannot be interpreted into a statute which is plain and unambiguous, and which does not express it. The legal presumption is that the legislative body expressed its intention, that it intended what it expressed, and that it intended nothing more. U. S. v. Wiltberger, 5 Wheat. 76, 5 L. Ed. 37; Insurance Co. v. Champlin (C. C. A.) 116 Fed. 858; Cold Blast Transp. Co. v. Kansas City Bolt & Nut Co. (C. C. A.) 114 Fed. 77, 81; Railway Co. v. Bagley, 60 Kan. 424, 431, 56 Pac. 759; Woolsey v. Ryan, 59 Kan. 601, 54 Pac. 664; Davie v. Mining Co., 93 Mich. 491, 53 N. W. 625, 24 L. R. A. 357; Vogel v. Pekoc, 157 Ill. 339, 42 N. E. 386, 30 L. R. A. 491; Campbell v. Lambert, 36 La. Ann. 35, 51 Am. Rep. 1; Turnpike Co. v. Coy, 13 Ohio St. 84; Stensgaard v. Smith, 43 Minn. 11, 44 N. W. 669, 19 Am. St. Rep. 205. Construction and interpretation have no place or office where the terms of a statute are clear and certain, and its meaning is plain. In such a case they serve only to create doubt and to confuse the judgment. When the language of a statute is unambiguous, and its meaning evident, it must be held to mean what it plainly expresses, and no room is left for construction. Swarts v. Siegel (C. C. A.) 117 Fed. 13; Knox Co. v. Morton, 15 C. C. A. 671, 673, 68 Fed. 787, 789; Railway Co. v. Sage, 17 C. C. A. 558, 565, 71 Fed. 40, 47; U. S. v.

Fisher, 2 Cranch, 358, 399, 2 L. Ed. 304; Railway Co. v. Phelps, 137 U. S. 528, 536, 11 Sup. Ct. 168, 24 L. Ed. 767.

This statute clearly prohibits the use of any engine in moving interstate commerce not equipped with a power driving wheel brake, and the use of any car not equipped with automatic couplers, under a penalty of $100 for each offense; and it just as plainly omits to forbid, under that or any penalty, the use of any car which is not equipped with a power driving wheel brake, and the use of any engine that is not equipped with automatic couplers. This striking omission to express any intention to prohibit the use of engines unequipped with automatic couplers raises the legal presumption that no such intention existed, and prohibits the courts from importing such a purpose into the act, and enacting provisions to give it effect. The familiar rule that the expression of one thing is the exclusion of others points to the same conclusion. Section 2 of the act does not declare that it shall be unlawful to use any engine or car not equipped with automatic couplers, but that it shall be unlawful only to use any car lacking this equipment. This clear and concise definition of the unlawful act is a cogent and persuasive argument against the contention that the use without couplers of locomotives, hand cars, or other means of conducting interstate traffic, was made a misdemeanor by this act. Where the statute enumerates the persons, things, or acts affected by it, there is an implied exclusion of all others. Suth. St. Const. § 227. And when the title of this statute and its first section are again read; when it is perceived that it was not from inattention, thoughtlessness, or forgetfulness; that it was not because locomotives were overlooked or out of mind, but that it was advisedly and after careful consideration of the equipment which they should have, that congress forbade the use of cars alone without automatic couplers; when it is seen that the title of the act is to compel common carriers to "equip their cars with automatic couplers * * * and their locomotives with driving wheel brakes"; that the first section makes it unlawful to use locomotives not equipped with such brakes, and the second section declares it to be illegal to use cars without automatic couplers,—the argument becomes unanswerable and conclusive.

Again, this act of congress changes the common law. Before its enactment, servants coupling cars used in interstate commerce without automatic couplers assumed the risk and danger of that employment, and carriers were not liable for injuries which their employés suffered in the discharge of this duty. Since its passage the employés no longer assume this risk, and, if they are free from contributory negligence, they may recover for the damages they sustain in this work. A statute which thus changes the common law must be strictly construed. The common or the general law is not further abrogated by such a statute than the clear import of its language necessarily requires. Shaw v. Railroad Co., 101 U. S. 557, 565, 25 L. Ed. 892; Fitzgerald v. Quann, 109 N. Y. 441, 445, 17 N. E. 354; Brown v. Barry, 3 Dall. 365, 367, 1 L. Ed. 638. The language of this statute does not require the abrogation of the common law that the servant assumes the risk of coupling a locomotive without automatic couplers with a car which is provided with them.

Moreover, this is a penal statute, and it may not be so broadened by judicial construction as to make it cover and permit the punishment of an act which is not denounced by the fair import of its terms. The acts which this statute declares to be unlawful, and for the commission of which it imposes a penalty, were lawful before its enactment, and their performance subjected to no penalty or liability. It makes that unlawful which was lawful before its passage, and it imposes a penalty for its performance. Nor is this penalty a mere forfeiture for the benefit of the party aggrieved or injured. It is a penalty prescribed by the statute, and recoverable by the government. It is, therefore, under every definition of the term, a penal statute. The act which lies at the foundation of this suit—the use of a locomotive which was not equipped with a Miller hook to turn a car which was duly equipped with automatic couplers—was therefore unlawful or lawful as it was or was not forbidden by this statute. That act has been done. When it was done it was neither forbidden nor declared to be unlawful by the express terms of this law. There is no language in it which makes it unlawful to use in interstate commerce a locomotive engine which is not equipped with automatic couplers. The argument of counsel for the plaintiff is, however, that the statute should be construed to make this act unlawful because it falls within the mischief which congress was seeking to remedy, and hence it should be presumed that the legislative body intended to denounce this act as much as that which it forbade by the terms of the law. An ex post facto statute which would make such an innocent act a crime would be violative of the basic principles of Anglo-Saxon jurisprudence. An ex post facto construction which has the same effect is equally abhorrent to the sense of justice and of reason. The mischief at which a statute was leveled, and the fact that other acts which it does not denounce are within the mischief, and of equal atrocity with those which it forbids, do not raise the presumption that the legislative body which enacted it had the intention, which the law does not express, to prohibit the performance of the acts which it does not forbid. Nor will they warrant a construction which imports into the statute such a prohibition. The intention of the legislature and the meaning of a penal statute must be found in the language actually used, interpreted according to its fair and usual meaning, and not in the evils which it was intended to remedy, nor in the assumed secret intention of the lawmakers to accomplish that which they did not express. U. S. v. Wiltberger, 5 Wheat. 76, 5 L. Ed. 37; Sarlls v. U. S., 152 U. S. 570, 14 Sup. Ct. 720, 38 L. Ed. 556; U. S. v. Harris, 177 U. S. 305, 309, 20 Sup. Ct. 609, 44 L. Ed. 780; Suth. St. Const. § 208. The decision and opinion of the supreme court in U. S. v. Harris, 177 U. S. 305, 309, 20 Sup. Ct. 609, 44 L. Ed. 780, is persuasive—nay, it is decisive—in the case before us. The question there presented was analogous to that here in issue. It was whether congress intended to include receivers managing a railroad among those who were prohibited from confining cattle, sheep, and other animals in cars more than 28 consecutive hours without unloading them for rest, water, and feeding, under "An act to prevent cruelty to animals while in transit by railroad or other

means of transportation," approved March 3, 1873, and published in the Revised Statutes as sections 4386, 4387, 4388, and 4389. This statute forbids the confinement of stock in cars by any railroad company engaged in interstate commerce more than 28 consecutive hours, and prescribes a penalty of $500 for a violation of its provisions. The plain purpose of the act was to prohibit the confinement of stock while in transit for an unreasonable length of time. The confinement of cattle by receivers operating a railroad was as injurious as their confinement by a railroad company, and the argument for the United States was that, as such acts committed by receivers were plainly within the mischief congress was seeking to remedy, the conclusion should be that it intended to prohibit receivers, as well as railroad companies, from the commission of the forbidden acts, and hence that receivers were subject to the provisions of the law. The supreme court conceded that the confinement of stock in transit was within the mischief that congress sought to remedy. But it held that as the act did not, by its terms, forbid such acts when committed by receivers, it could not presume the intention of congress to do so, and import such a provision into the plain terms of the law. Mr. Justice Shiras, who delivered the unanimous opinion of the court, said:

"Giving all proper force to the contention of the counsel for the government, that there has been some relaxation on the part of the courts in applying the rule of strict construction to such statutes, it still remains that the intention of a penal statute must be found in the language actually used, interpreted according to its fair and obvious meaning. It is not permitted to courts, in this class of cases, to attribute inadvertence or oversight to the legislature when enumerating the classes of persons who are subjected to a penal enactment, nor to depart from the settled meaning of words or phrases in order to bring persons not named or distinctly described within the supposed purpose of the statute."

He cited with approval the decision of the supreme court in Sarlls v. U. S., 152 U..S. 570, 575, 14 Sup. Ct. 720, 38 L. Ed. 556, to the effect that lager beer was not included within the meaning of the term "spirituous liquors" in the penal statute found in section 2139 of the Revised Statutes, and closed the discussion with the following quotation from the opinion of Chief Justice Marshall in U. S. v. Wiltberger, 5 Wheat. 76, 5 L. Ed. 37:

"The rule that penal statutes are to be construed strictly is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals, and on the plain principle that the power of punishment is vested in the legislative, and not in the judicial, department. It is the legislature, not the court, which is to define a crime and ordain its punishment. It is said that, notwithstanding this rule, the intention of the lawmaker must govern in the construction of penal as well as other statutes. But this is not a new, independent rule, which subverts the old. It is a modification of the ancient maxim, and amounts to this: that, though penal statutes are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of the legislature. The maxim is not to be applied so as to narrow the words of the statute, to the exclusion of cases which those words, in their ordinary acceptation, or in that sense in which the legislature ordinarily used them, would comprehend. The intention of the legislature is to be collected from the words they employ. Where there is no ambiguity in the words, there is no room for construction. The case must be a strong one, indeed, which would justify a court in depart-

ing from the plain meaning of words,—especially in a penal act,—in search of an intention which the words themselves did not suggest. To determine that a case is within the intention of a statute, its language must authorize us to say so. It would be dangerous, indeed, to carry the principle that a case which is within the reason or mischief of a statute is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity or of a kindred character with those which are enumerated. If this principle has ever been recognized in expounding criminal law, it has been in cases of considerable irritation, which it would be unsafe to consider as precedents forming a general rule in other cases."

The act of March 2, 1893, is a penal statute, and it changes the common law. It makes that unlawful which was innocent before its enactment, and imposes a penalty, recoverable by the government. Its terms are plain and free from doubt, and its meaning is clear. It declares that it is unlawful for a common carrier to use in interstate commerce a car which is not equipped with automatic couplers, and it omits to declare that it is illegal for a common carrier to use a locomotive that is not so equipped. As congress expressed in this statute no intention to forbid the use of locomotives which were not provided with automatic couplers, the legal presumption is that it had no such intention, and provisions to import such an intention into the law and to effectuate it may not be lawfully enacted by judicial construction. The statute does not make it unlawful to use locomotives that are not equipped with automatic couplers in interstate commerce, and it did not modify the rule of the common law under which the plaintiff assumed the known risk of coupling such an engine to the dining car.

There are other considerations which lead to the same result. If we are in error in the conclusion already expressed, and if the word "car," in the second section of this statute, means locomotive, still this case does not fall under the law, (1) because both the locomotive and the dining car were equipped with automatic couplers; and (2) because at the time of the accident they were not "used in moving interstate traffic."

For the reasons which have been stated, this statute may not be lawfully extended by judicial construction beyond the fair meaning of its language. There is nothing in it which requires a common carrier engaged in interstate commerce to have every car on its railroad equipped with the same kind of coupling, or which requires it to have every car equipped with a coupler which will couple automatically with every other coupler with which it may be brought into contact in the usual course of business upon a great transcontinental system of railroads. If the lawmakers had intended to require such an equipment, it would have been easy for them to have said so, and the fact that they made no such requirement raises the legal presumption that they intended to make none. Nor is the reason for their omission to do so far to seek or difficult to perceive. There are several kinds or makes of practical and efficient automatic couplers. Some railroad companies use one kind; others have adopted other kinds. Couplers of each kind will couple automatically with others of the same kind or construction. But some couplers will not couple automatically with couplers of different construction. Railroad com-

panies engaged in interstate commerce are required to haul over their roads cars equipped with all these couplers. They cannot relieve themselves from this obligation or renounce this public duty for the simple reason that their cars or locomotives are not equipped with automatic couplers which will couple with those with which the cars of other roads are provided, and which will couple with equal facility with those of their kind. These facts and this situation were patent to the congress when it enacted this statute. It must have known the impracticability of providing every car with as many different couplers as it might meet upon a great system of railroads, and it made no such requirement. It doubtless knew the monopoly it would create by requiring every railroad company to use the same coupler, and it did not create this monopoly. The prohibition of the statute goes no farther than to bar the handling of a car "not equipped with couplers coupling automatically by impact and which can be uncoupled without the necessity of men going between the ends of the car." It does not bar the handling and use of a car which will couple automatically with couplers of its kind because it will not also couple automatically with couplers of all kinds, and it would be an unwarrantable extension of the terms of this law to import into it a provision to this effect. A car equipped with practical and efficient automatic couplers, such as the Janney couplers or the Miller hooks, which will couple automatically with those of their kind, fully and literally complies with the terms of the law, although these couplers will not couple automatically with automatic couplers of all kinds or constructions. The dining car and the locomotive were both so equipped. Each was provided with an automatic coupler which would couple with those of its kind, as provided by the statute, although they would not couple with each other. Each was accordingly equipped as the statute directs, and the defendant was guilty of no violation of it by their use.

Again, the statute declares it to be unlawful for a carrier "to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped," etc. It is not, then, unlawful, under this statute, for a carrier to haul a car not so equipped which is either used in intrastate traffic solely, or which is not used in any traffic at all. It would be no violation of the statute for a carrier to haul an empty car not used to move any interstate traffic from one end of its railroad to the other. It would be no violation of the law for it to haul such a car in its yards, on its side track, to put it into its trains, to move it in any manner it chose. It is only when a car is "used in moving interstate traffic" that it becomes unlawful to haul it unless it is equipped as the statute prescribes. On the day of this accident the dining car in this case was standing empty on the side track. The defendant drew it to a turntable, turned it, and placed it back upon the side track. The accident occurred during the performance of this act. The car was vacant when it went to the turntable, and vacant when it returned. It moved no traffic on its way. How could it be said to have been "used in moving interstate traffic" either while it was standing on the side track, or while it was going to and returning from the turntable? If the defendant had drawn it vacant over

every foot of its railroad, it would not have been engaged in moving interstate traffic, and it would not have fallen under the ban of the statute. How can it thus fall because it was moved in the same way over a small portion of the road? The argument of counsel for the plaintiff is that because it had been used in moving interstate traffic on its way from San Francisco to Promontory, and because it was the intention of the defendant to put it to the same use in a few hours, when a west-bound train arrived, it was impressed with the use of moving such traffic in the interim. But this statute must be read not only in the light of the rules of construction to which we have adverted in the earlier part of this opinion, but also in view of the limitations upon the power of congress in this respect. It is by virtue of the power granted to congress to "regulate commerce among the states," and by virtue of that authority alone, that this statute was enacted and has efficacy. Congress had neither the authority nor the purpose to interfere with or to touch by this act anything except commerce among the states. Is the turning of a vacant car which its owner intends to use at some future time in moving interstate traffic any part of commerce among the states? Does the intention of the owner as to a future use of an implement of transportation affect the character of the act of turning this car? If the defendant had intended to use this dining car for traffic within the state of Utah only, if it had intended to send it to the shop to be destroyed or repaired, or if, after the car was turned, it had changed its intention and concluded that it would not use it to move interstate traffic, would any of these intentions or this change of purpose have affected the act of turning the car, and have impressed it with a use in interstate commerce or intrastate commerce? The only answer to these questions is a negative one, and, if this be true, then the intention of the defendant to use this car at some future time in interstate commerce would not make the act of turning it a part of such commerce, nor bring it under the ban of the act of March 2, 1893. The opinion and decision of the supreme court in Coe v. Town of Errol, 116 U. S. 517, 525, 526, 6 Sup. Ct. 475, 29 L. Ed. 715, lend strong support to this view. In that case the owners of logs were cutting and transporting them for the purpose of exporting them from New Hampshire to Maine. The logs had been cut, drawn to and deposited in and on the banks of Clear stream, to be floated down that stream and down the Androscoggin river to the state of Maine, and the owners intended to transport them in this way to that state. They were lying in the town of Errol, awaiting water sufficient to float them down the stream. The supreme court held that they had not yet become subjects of interstate commerce; that they would not become such until they were "committed to the common carrier for transportation out of the state to the state of their destination, or have started on their ultimate passage to that state"; and that the fact that their owners intended to export them could not change their situation because the owners might change their intention. If commodities do not become articles of interstate commerce until they start on their final passage to another state, cars and engines cannot be "used in moving interstate traffic" until they receive articles of

interstate traffic, or start to carry them from one state to another, and the act of turning a vacant car at an intermediate station cannot be the use of that car in moving such traffic. This is the effect of the decision of the supreme court of appeals of Virginia in Norfolk & W. R. Co. v. Com., 24 S. E. 838, 34 L. R. A. 105, 57 Am. St. Rep. 827. That court held in that case, upon the authority of Coe v. Errol, that a train of empty coal cars on its way to procure a load of coal which the carrier intended to transport with these cars from one state to another was not engaged in interstate commerce, and would not be until it was loaded with the articles of such commerce, to be carried to another state or started on the way. Speaking of the effect of the intention of the carrier to use the cars in moving interstate traffic, that court said:

"The common carrier has the same right to change his mind, and ship on other cars than those which he may have provided for that purpose, and the cars which were intended for that purpose may never be used. The rule fixed by the supreme court in the one case seems equally applicable to the other." U. S. v. Boyer (D. C.) 85 Fed. 425, 432; Kelley v. Rhoads (Wyo.) 63 Pac. 935.

The power of congress over this subject was limited to the regulation of commerce among the states. It intended to exercise that power, but not to transgress its bounds. It prohibited the hauling of cars used in moving interstate traffic unless equipped as the act directs. The intention to use cars for that purpose does not constitute such a use because that intention may change. Coe v. Town of Errol, 116 U. S. 526, 6 Sup. Ct. 475, 29 L. Ed. 715; Norfolk & W. R. Co. v. Com. (Va.) 24 S. E. 838, 34 L. R. A. 105, 57 Am. St. Rep. 827. The fact that such cars have been or will be so used does not constitute their use in moving interstate traffic, because the prohibition is not of the hauling of cars that have been or will be used in such traffic, but only of those used in moving that traffic. Cars loaded with articles of interstate commerce, and started toward their ultimate destination, whether in trains, in yards, or on side tracks, may well be held to come within the terms of this statute and the intent of congress. But vacant cars which are not and may never be so used cannot be held to come within the fair import of the terms of this law either because their owner intends to use them for that purpose at some future time, or because they have been or will be so used. Empty cars in repair shops, in yards, on side tracks, those in use to transport traffic within a state and for that purpose alone, are not in use to move articles of interstate commerce, and do not fall under the ban of this law. Neither the empty dining car standing upon the side track, nor the freight engine which was used to turn it at the little station in Utah, was then used in moving interstate traffic, within the meaning of this statute, and this case did not fall within the provisions of this law.

The judgment below must accordingly be affirmed, and it is so ordered.

THAYER, Circuit Judge. I am unable to concur in the conclusion, announced by the majority of the court, that the act of con-

gress of March 2, 1893 (27 Stat. 531, c. 196), does not require locomotive engines to be equipped with automatic couplers; and I am equally unable to concur in the other conclusion announced by my associates that the dining car in question at the time of the accident was not engaged or being used in moving interstate traffic.

In my judgment, it is a very technical interpretation of the provisions of the act in question, and one which is neither in accord with its spirit nor with the obvious purpose of the lawmaker, to say that congress did not intend to require engines to be equipped with automatic couplers. The statute is remedial in its nature; it was passed for the protection of human life; and there was certainly as much, if not greater, need that engines should be equipped to couple automatically, as that ordinary cars should be so equipped, since engines have occasion to make couplings more frequently. In my opinion, the true view is that engines are included by the words "any car," as used in the second section of the act. The word "car" is generic, and may well be held to comprehend a locomotive or any other similiar vehicle which moves on wheels; and especially should it be so held in a case like the one now in hand, where no satisfactory reason has been assigned or can be given which would probably have influenced congress to permit locomotives to be used without automatic coupling appliances.

I am also of opinion that, within the fair intent and import of the act, the dining car in question at the time of the accident was being hauled or used in interstate traffic. The reasoning by which a contrary conclusion is reached seems to me to be altogether too refined and unsatisfactory to be of any practical value. It was a car which at the time was employed in no other service than to furnish meals to passengers between Ogden and San Francisco. It had not been taken out of that service, even for repairs or for any other use, when the accident occurred, but was engaged therein to the same extent that it would have been if it had been hauled through to Ogden, and if the accident had there occurred while it was being turned to make the return trip to San Francisco. The cars composing a train which is regularly employed in interstate traffic ought to be regarded as used in that traffic while the train is being made up with a view to an immediate departure on an interstate journey as well as after the journey has actually begun. I accordingly dissent from the conclusion of the majority of the court on this point.

While I dissent on the foregoing propositions, I concur in the other view which is expressed in the opinion of the majority, to the effect that the case discloses no substantial violation of the provisions of the act of congress, because both the engine and the dining car were equipped with automatic coupling appliances. In this respect the case discloses a compliance with the law, and the ordinary rule governing the liability of the defendant company should be applied. The difficulty was that the car and engine were equipped with couplers of a different pattern, which would not couple, for that reason, without a link. Janney couplers and Miller couplers are in common use on the leading railroads of the country, and congress did not see fit to command the use of either style of automatic coupler to the

exclusion of the other, while it must have foreseen that, owing to the manner in which cars were ordinarily handled and exchanged, it would sometimes happen, as in the case at bar, that cars having different styles of automatic couplers would necessarily be brought in contact in the same train. It made no express provision for such an emergency, but declared generally that, after a certain date, cars should be provided with couplers coupling automatically. The engine and dining car were so equipped in the present instance, and there was no such violation of the provisions of the statute as should render the defendant company liable to the plaintiff by virtue of the provisions contained in the eighth section of the act. In other words, the plaintiff assumed the risk of making the coupling in the course of which he sustained the injury. On this ground I concur in the order affirming the judgment below.