# SUPREME COURT

OF THE

## STATE OF COLORADO.

## April Term, 1908.

[No. 4886.]

THE RIO GRANDE SOUTHERN RAILROAD COMPANY v.
CAMPBELL.

1. Master and Servant—Injuries to Servant—Railroads—Acts of
   Congress—Automatic Couplers—Interstate Commerce.

   In an action by an employee against a railroad company for
injuries alleged to have resulted from defendant's failure to use
automatic couplers, as required by act of congress, plaintiff can-
not recover without showing that the cars in question were loaded
with articles destined to some point outside the state.—P. 13.

2. Appellate Practice—Error—Presumption of Prejudice.

   The general rule is, that error is presumed prejudicial to the
party excepting thereto unless it affirmatively appears that it was
not, and the rights of litigants can only be preserved by adhering
to this rule. Cases should be tried before a jury on competent
testimony, and when a party insists on getting before them testi-
mony which is incompetent, he does so at his peril, and thereby
has imposed on him, upon review, the burden of showing that the
jury was not influenced in his favor thereby.—P. 14.

**3. Same.**

In an action by an employee of a railroad company for injuries alleged to have resulted from defendant's failure to use automatic couplers, as required by act of congress, the testimony showed that the cars complained of were not provided with automatic couplers, but that they were not then engaged in interstate commerce; and the trial court undertook to cure the error in admitting such evidence by instructing the jury that the act of congress referred to was not involved, and that no liability of defendant could be predicated in violation thereof. Held, that it cannot be said that such error was cured by the instruction, and it will be presumed to be prejudicial to the party excepting thereto, unless the contrary affirmatively appears.—P. 17.

**4. Interstate and Intrastate Commerce—Power of Congress.**

State affairs are under the exclusive control of the respective states, and the act of congress requiring railroads engaged in interstate commerce to equip their cars with automatic couplers cannot be extended to cars of such companies when employed only in the carriage of commerce between points in the state. —P. 17.

**5. Practice in Civil Actions — Instructions — Withdrawal of Evidence.**

In an action by an employee against a railroad company for injuries, one ground of recovery being defendant's failure to use automatic couplers as required by act of congress, the evidence showed that, at the time of the injury, the cars were not engaged in interstate commerce, but that defendant sometimes engaged in interstate commerce, and that it had failed to provide such couplers. Held, that an instruction that the act of congress requiring common carriers engaged in interstate commerce to equip their cars with automatic couplers was not involved, and that no liability to plaintiff could be predicated upon the violation thereof by defendant, was faulty, if not erroneous, in failing to advise the jury that all testimony bearing on the subject of defendant being engaged in interstate commerce was withdrawn from their consideration.—P. 17.

**6. Practice in Civil Actions—Allegations Not Supported by Evidence—Submission to Jury.**

In an action for personal injuries alleged to have resulted from various acts of negligence of defendant, allegations of negligence which the testimony eliminated from the case, and as to which there was no testimony, should not be submitted to the jury.—P. 18.

7. Master and Servant — Injuries to Servant—Negligence—Evi-
dence—Admissibility—Other Acts.

In an action by a servant against a railroad company for
personal injuries, the only material issue was whether defendant
had been negligent as to the cars between which plaintiff was
injured. Held, that evidence that the car inspector employed at
certain yards was negligent, and in the habit of using liquors to
excess, was inadmissible in the absence of testimony that the
cars in question had ever been in such yards, or had been in-
spected by or had come under the supervision of such inspector;
since the rule is, that evidence of other independent and discon-
nected acts of negligence are not admissible to establish the neg-
ligence charged.—P. 19.

8. Practice in Civil Actions—Instructions—Applicability to Evi-
dence.

In an action for personal injuries, an instruction authorizing
a verdict for expenses for outlay for physicians and nurses was
erroneous, where the evidence failed to show any such expense;
but, on the contrary, showed that plaintiff's injury was treated
free at a hospital maintained by defendant.—P. 20.

9. Practice in Civil Actions—Instructions—Form.

The purpose of instructions being to enlighten the jury and
direct attention to the specific issue, they should not be unneces-
sarily voluminous, and should embrace only the statements of
law by which the evidence is to be examined and applied.—P. 20.

10. Damages—Personal Injuries — Amount Not Affected by Do-
mestic Status—Evidence.

The amount of recovery for personal injuries cannot be af-
fected by whether plaintiff is unmarried or married, or has a large
family; and any evidence on either of these subjects would be
incompetent.—P. 21.

*Appeal from the District Court of La Plata County.
Hon. Jas. L. Russell, Judge.*

Action by Samuel M. Campbell against The Rio
Grande Southern Railroad Company. From a judg-
ment for plaintiff, defendant appeals.

*Reversed and remanded.*

Messrs. VAILE & WATERMAN and Mr. ELROY N.
CLARK (Mr. WM. W. FIELD, of counsel), for appel-
lant.

Messrs. Stuart & Murray and Mr. Chas. A. Johnson, for appellee.

Mr. Justice Gabbert delivered the opinion of the court:

Appellee was employed by the appellant in the capacity of brakeman on a freight train. In coupling cars he was injured and brought suit against the railroad company to recover damages, basing his right thereto upon the ground that his injury was caused through the negligence of the appellant. The negligence charged was:

(1) That the defendant was engaged in interstate commerce, and did not comply with the act of congress which required its trains and locomotives to be equipped with certain safety appliances, in that its locomotive was not equipped with a power driving-wheel brake, and the cars which plaintiff attempted to couple were not equipped with automatic couplers coupling by impact, so that such cars could be coupled or uncoupled without the necessity of the person engaged in doing this work going between the cars; and.

(2) What may be designated "common-law negligence," in that the coupling appliances on the cars which plaintiff attempted to couple were defective and the engine operating the train upon which he was employed and injured was old, worn and weak, and not of sufficient power and strength to properly handle the train by the exercise of steady power. The defects in the coupling appliances alleged were, that the nuts intended to hold the draw-bars were loose or lost, so that when the draw-heads on the respective cars which plaintiff attempted to couple came together, the draw-bars bent down and thereby allowed the ends of the cars to come together, whereby plaintiff was caught and injured. The defects in

the locomotive, as charged, were in effect that its parts were worn and imperfect, so that it could not be moved with a steady and uniform degree of speed, with the result that it did not move steadily, and could not be safely controlled by the engineer, and that the wheels thereof were greatly worn and cupped, so that at times they would slip upon the rails, and at other times seize them, and thus instantly increase the speed of the train, which it was attempting to handle, and that these defects caused the cars which plaintiff was attempting to couple to come together with great force, by means of which the drawheads and couplings of such cars were turned down, and plaintiff was crushed.

The answer, in effect, denied that the defendant was engaged in interstate commerce in moving the train upon which the plaintiff was employed; denied that it was guilty of the other acts of negligence charged, and pleaded contributory negligence on behalf of the plaintiff. The trial of the case resulted in a verdict in favor of plaintiff for $7,000, upon which a judgment was entered. From this judgment the defendant appeals.

The train upon which plaintiff was employed operated between Rico and Durango. On its way to Durango, at Porter Station, it picked up car No. 1050, loaded with coal. Appellee made the couplings which brought this car into the train, and, according to his own testimony, inspected the car and found the coupling in good order, so far as it was possible for him to ascertain. Beyond Porter Station, car No. 1925, loaded with brick, was attached to the train. Appellee also coupled this car into the train, and stated that he inspected the coupling apparatus, and discovered nothing wrong about it. The train then proceeded towards Durango, and when it reached the smelters near that city, halted to drop out several

cars. To accomplish this, plaintiff uncoupled that portion of the train which contained these cars, and No. 1925 from 1050. The train crew then proceeded to place the cars intended to be left at the smelters on the smelter siding, where they were uncoupled from 1925, so that 1925 was the rear car of the front, or moving, end of the train, and 1050 the front car of the part left standing. Plaintiff took a position on the rear of 1925, and the train was backed out on the main track to couple on the part left standing. This part was on a straight track, the part moving being upon a curve and up-grade as it approached 1050. The appellee signalled for a coupling, and when the cars came together the draw-heads were bent downward, whereby the cars came sufficiently close to each other to catch his right leg between the dead-woods, with the result that his right leg was broken, and he was otherwise injured.

The engineer in charge of the locomotive operating the train was called as a witness on the part of the plaintiff. From his testimony it appears that the engine was worn and the driving wheels cupped to some extent, but that this wear and condition did not affect its efficiency in handling the train in question. He says, in substance, that the engine was only backing three cars; that it moved all right when backing up for the coupling, moved steadily and was under perfect control. Plaintiff testifies that in making the coupling the locomotive did not bring the cars together with any extra force, but in the way any locomotive would; that the movement of the locomotive was a continuous one; that there was not exactly what might be called a jar, but a jerk, but that the jerk was not sufficient to cause the draw-heads to turn down had the nuts been in place.

On behalf of the defendant the fireman testified in substance that in making the coupling the engine

moved steadily, and that taking into consideration the load she was moving and the curve and grade over which she was passing, although her wheels were cupped to some extent, they would not slip. This is all the testimony touching the alleged defects of the locomotive. With respect to the coupling apparatus, plaintiff testifies in substance that the link was in 1925, the forward car; that he entered the link in the draw-head of 1050; that prior to attempting to couple the cars he made an effort, so far as he had an opportunity, to observe what the condition of the couplers was, but did not discover there was anything wrong with either of them, and that the draw-heads apparently stood all right. He assisted in picking up both these cars, and attaching them to the train, and says if the draw-heads were not snug against the spring-boards, he did not observe it.

On behalf of plaintiff Fred Weller testified, in substance, that he observed the accident to plaintiff; that he ran over to the train, and then and there made an examination of the draw-heads, end-sills and draw-stems of cars 1050 and 1925; that on one car the nut of the draw-stem was partially over the key-hole and on the other clear past; that one nut was about an inch and the other about two or three inches from the proper place, and that there were no keys behind the nuts on either car. He further testifies that he made some repairs on car 1050 that evening, and found that the draw-stem would slide back and forth because the nut was not in its proper position by about an inch and a half; that he put in a new draw-stem, key and washer, and spiked up the splinters in the dead-wood or spring-board, and left the car in a good condition to go on the road.

Witness Gratz, on behalf of the defendant, testified that he examined the cars between which plaintiff had been injured and found that both draw-heads

were turned down and the dead-wood split; that the following morning they were placed on the rip track for repairs; that he got under the cars to examine the condition of the draw-stems, washers and keys, and found all in place; that the nuts were drawn so tight that it took two men with a thirty-inch wrench to loosen them; and that these cars were both repaired under his direction.

Witness Joe Weller, father of the witness Fred Weller, testified that after plaintiff was injured he made a general inspection of the draw-stems, nuts, bolts and keys, and found everything in proper place, snug and tight, except for the bent position of the draw-stems, and that on the next day, while the cars were on the rip track, he made a further examination and found the cars in the same condition they were the evening before, and that no repairs had been made upon either of them until they came on the rip track. He further positively testifies that the two cars were repaired the next day after plaintiff was injured, by Fred Weller and Mike Morris.

It further appears from the records kept at the shop of the railroad company that these repairs were made at the time testified by the witness, Joe Weller, and that no time was claimed by Fred Weller for repairs made the evening of the 8th, as claimed by him.

The engineer, fireman, conductor and another witness testify that they went to the point where the plaintiff was injured, and that they did not see Fred Weller make any inspection of the cars while they were there.

The testimony is undisputed that the draw-bars were bent down in the dead-wood of each car, which was split by this means. With the exception of Fred Weller, the witnesses say the dead-woods were so badly damaged that new ones had to be, and were, put in. The testimony discloses that both draw-

heads were exactly the same height from the track. Referring further to the testimony of the plaintiff on the subject of the draw-heads turning down, he says:

"One cause is the link not being entered might cause them to turn down. Another reason is too much force, that they have to give way. The next cause is that this nut, right there, might not be tight, so as there could be a little slack in there. I entered the link, so it was not caused by not being entered. From the way they caught it must have been the nut wasn't tight. I did not see any other cause. The jerk was not sufficient."

Again he says: "There are three possible causes for the turning down of the draw-heads on cars being coupled together. One is the fact of the person making the coupling failing to enter the link. It goes over the end. Another is the cars being coupled coming together with too great an impact; and the third is the absence of the nut from the draw-stem. I didn't and don't know the cause of the going down of these draw-heads."

Counsel for the railroad company contend that the evidence is insufficient to establish that any defect in the locomotive or in the coupling apparatus to which the testimony so far considered is directed, caused the injury to plaintiff. So far as the locomotive is concerned, there is no evidence that its condition or operation caused the draw-bars and draw-heads to turn down. Plaintiff sets this question at rest by his own statement to the effect that the impact was not sufficient to have this effect on the draw-heads if the nuts on the draw-bars had been in place. If we eliminate the testimony of Fred Weller, there is none which directly tends to prove that the nuts on the draw-bars were lost or not in place. He is disputed by every other witness testifying on this subject; and it seems rather strange, to say the least,

that he should have repaired No. 1050 the evening
after plaintiff was injured, but that there should be
no record of materials used or of the time he was
employed, and that he never made any claim against
the company for this time.   Neither is his statement
that he repaired the dead-wood of 1050 by spiking
the splinters, very reasonable.   He does not deny,
that 1925 was placed on the rip track for repairs; and
it seems from the testimony as a whole, that it was
just as necessary to place 1050 on that track in order
to repair it.   Again he says, in substance, the nut
was on the draw-bar on 1050, but not in place.   It is
almost certain that the turning down of the draw-
head on that car would have forced the nut of the
draw-stem so tightly against the sill that it would
have been extremely difficult, if not impossible, for
one man, without the car standing on a repair track,
to have removed it.   The only other testimony which
tends in the slightest degree to establish a condition
of the draw-bars on the cars which might have been
the cause of their turning down, is that of the plain-
tiff, and that is not direct.   He mentions three causes,
either of which would result in turning down the
draw-bars: (1) If the link was not entered; (2) too
much force in bringing the cars together; and (3)
that the nuts on the draw-bars were not in place.

Plaintiff says that the impact did not cause the
draw-bars to turn down, so that consideration of the
question of the force used in bringing the cars to-
gether is rendered unnecessary.   He says that the
link was properly entered in the draw-head of 1050
when he attempted to make the coupling, so that,
according to his own statement, the failure to prop-
erly enter the link was not the cause of his injury.
The only remaining cause which he assigns for the
draw-bars being turned down, is, that the nuts were
not tight on the draw-bars.   This is but a surmise

upon his part, because of his conclusion that there were no other causes. As we understand the mechanism of draw-heads and draw-bars, it is substantially as follows: The draw-head is a short, heavy mass of iron or steel, having on one face a large open mouth to receive the coupling link, and on the other a broad, flat base to fit against the dead-wood or spring-board of the car to which it is attached by drift-bolts inserted from the rear of the spring-board, but not supplied with nuts, the purpose of the drift-bolts being merely to keep the draw-head from turning. Through the draw-head passes a bolt which is denominated a draw-bar. This bolt passes through the spring-board and also through another timber behind it, and is secured by a nut at the back of this timber, so as to prevent the draw-bolt from pulling out. If this nut is not snug against the timber or sill of the car, the draw-bolt will work back and forth, with the result that at times the base of the draw-head, which should fit snugly against the spring-board or dead-wood, would be as far from this timber as the nut would give it play by reason of its not being in proper place. This condition would be noticeable in coupling and uncoupling cars. Plaintiff coupled both 1050 and 1925 into the train; says that he looked at the coupling apparatus of each and did not notice that either of the draw-heads was out of place. It appears that the draw-heads upon these cars are the same height from the track; so that when they would come in contact with each other, if the nuts were loose the result would be to drive the base of each against the spring-board against which it worked, and each would thereby be in exactly the same position as though the nuts were tightly drawn. Such being the result which it is apparent would naturally follow when the draw-heads of 1050 and 1925 came in contact, even though the draw-bar nuts were loose,

the theory of plaintiff that the draw-bars turned down because the nuts were loose does not seem very plausible. Had the link missed entering the draw-head of 1050 and passed below it, the effect would be to force down the draw-head of 1925, the upper lip of which might catch in the lower lip of the draw-head of 1050, and in this position the impact of the cars, although not unnecessarily great, would cause the draw-heads to turn down, as they did in this instance. It is true plaintiff says this did not occur, but he might be mistaken in this respect, in view of the fact that although the nuts might have been loose, the position which the draw-heads would assume as soon as they came in contact would be the same as though the nuts had been tightly drawn. So far, then, as plaintiff's testimony is concerned, the cause of the draw-bars turning down is only surmise, or a conclusion upon his part that one certain cause caused the draw-bars to turn down because others did not. That the cause of the draw-bars turning down is only surmise upon the part of plaintiff is also strengthened by his statement to the effect that he does not know what caused them to turn down. It is not necessary, however, to determine whether the evidence bearing on the subject of the draw-bars turning down is sufficient to establish that this was caused by the negligence of the defendant company, because there are other errors assigned for which the judgment must be reversed, and we have called attention to the testimony so far considered for the purpose of showing that it was of such a character as required careful consideration at the hands of the jury, uninfluenced by any bias or prejudice which might arise through the introduction of incompetent testimony.

The road of defendant is entirely located within the state of Colorado. Over the objection of defend-

ant, plaintiff was permitted to introduce testimony to prove that it frequently received from, and delivered to, connecting lines passengers and freight which had come from, or were destined to, points without the state. This was error. The question in the case was not whether the defendant at times was engaged in interstate commerce, but whether the particular cars between which plaintiff was injured in attempting to couple them were engaged in moving interstate traffic. Before he would be entitled to recover by virtue of the provisions of the act of congress, requiring railroads engaged in interstate commerce to equip their cars with automatic couplers, it was incumbent upon him to show that cars 1050 and 1925 were loaded with articles destined to some point outside of the state.—*Winkler v. Phila. & R. Ry. Co.*, 53 Atl. (Del.) 90; *Southern Pacific R. Co. v. Johnson*, 117 Fed. 462; *Rosney v. Erie R. Co.*, 135 Fed. 311.

There was no evidence whatever on the part of plaintiff to show that these cars were engaged in moving interstate traffic. On the contrary, if there is anything in the record which can be considered as bearing on this subject, it shows that they were loaded with articles destined for Silverton, in this state. The trial court undertook to cure this error by instructing the jury to the effect that the act of congress requiring common carriers engaged in interstate commerce to equip their cars with automatic couplers, was not involved, and that no liability of the defendant to the plaintiff could be predicated upon the violation thereof by the defendant. The general rule is, that error is presumed prejudicial to the party excepting thereto unless it affirmatively appears that it was not. We cannot say that the error was cured by the instruction referred to. The tendency of the testimony under consideration would be to influence

the jury in favor of the plaintiff, and must, therefore, be regarded as having this effect unless it clearly appears that the defendant was not prejudiced thereby.—*Erben v. Lorrilard,* 19 N. Y. 299; *Con. & Pass. R. R. Co. v. Baxter,* 32 Vt. 805; *Howe Machine Co. v. Rosine,* 87 Ill. 105.

The rights of litigants can only be preserved by adhering to this rule. Cases should be tried before a jury on competent testimony, and when a party insists in getting before them testimony which is incompetent, he does so at his peril, and thereby has imposed upon him, when the case is reviewed, the burden of showing that the jury was not influenced in his favor thereby. As we have already pointed out, the testimony bearing on the subject of the negligence of the defendant was close, to say the least; and when the jury were advised that the defendant had engaged in interstate commerce and that an act of congress required railroads so engaged to equip their cars with automatic couplers, it is impossible to tell to what extent it may have influenced the jury in rendering its verdict, or to what extent, when it happened that the cars between which plaintiff was injured were not equipped with automatic couplers, it may have created a prejudice in the minds of the jury which prevented them from giving that careful consideration to the competent testimony bearing on the subject of the defendant's negligence which they should.

At the time of the trial the decision in *Southern Pacific R. Co. v. Johnson, supra,* had been rendered and was known to counsel. It was an authoritative construction of the act of congress to which we have referred by the circuit court of appeals for the eighth circuit, which includes Colorado, binding upon the courts of this state, and there was no excuse for attempting to establish the liability of defendant under

that act, except by competent testimony. But counsel for the plaintiff say that this case has been reversed by the supreme court of the United States on error to the circuit court of appeals, which rendered it, in *Johnson v. Southern Pacific R. Co.*, 196 U. S. 1. It was reversed, but not upon the point that a common carrier engaged in interstate commerce must equip its cars engaged only in intrastate traffic with automatic couplers. The facts in the case are substantially as follows: The defendant operated passenger trains between San Francisco, Cal., and Ogden, Utah. It was in the habit of drawing a dining car in these trains. Such a car formed a part of the train between San Francisco and Ogden. At the latter point it was ordinarily turned, and put into a train going to San Francisco. The east-bound train of the defendant was so late that it was not practicable to get the dining car into Ogden in time to place it in the next west-bound train, and it was left at Promontory, Utah, to be picked up by the west-bound train when it arrived. While it was standing on the side track at Promontory, the conductor of a freight train was directed to take it to a turntable, turn it, and place it back upon the side track so that it would be ready to return to San Francisco. The conductor instructed his crew to carry out this direction. Johnson was the head brakeman, and he undertook to couple the engine to the dining car for the purpose of carrying out the order of the conductor. The freight engine was equipped with a Janney coupler, and the dining car with a Miller hook or Miller coupler. These couplers would not couple automatically with each other, and Johnson undertook to make the coupling by means of a link and pin, and in doing so was injured. He brought suit to recover damages, and, in so far as material to the present case, the circuit court of appeals held that, at the time Johnson

undertook to make the coupling, the dining car was not employed in interstate traffic. This conclusion or holding was reversed by the supreme court of the United States, the holding of that tribunal being that a dining car regularly engaged in interstate traffic does not cease to be so when waiting for the train to make the next trip. But that does not in any manner modify the decision of the court of appeals, or the other decisions to which we have referred, construing the act of congress under consideration, which are to the effect that the moving of cars by a railroad company at times engaged in interstate commerce, then employed in intrastate traffic only, does not require it to equip such cars with automatic couplers. Such is the construction given the Johnson case by the United States circuit court of appeals for the second circuit, in *Rosney v. Erie Co., supra.* This conclusion is fully supported and the question under consideration conclusively settled contrary to the contention of counsel for plaintiff that the defendant under the act of congress was required to equip its cars between which plaintiff was injured with automatic couplers, by the very recent decision of the supreme court of the United States in *Howard v. Ill. C. R. R. Co.,* 28 Sup. Ct. Rep. 141, and other cases considered at the same time. In these cases the court had under consideration the constitutionality of the act of congress of 1906 relating to the liability of common carriers engaged in commerce between the states for injuries sustained by their employees resulting from "the negligence of any of its officers, agents or employees, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, roadbed, ways or works," which was held unconstitutional because it imposed a liability upon a common carrier engaged in interstate commerce for any injuries sustained by

its employees when engaged in operating trains exclusively employed in intrastate commerce. The power of congress under the constitution does not extend to the regulation of purely state affairs. That power rests with the states, and speaking of the contention that because congress has the power to regulate interstate commerce, that therefore such power may be exercised over a common carrier engaged in interstate and intrastate traffic, because a carrier so engaged submits all its business concerns to the regulating power of congress, the learned justice writing the opinion said:

"It is apparent that if the contention were well founded it would extend the power of congress to every conceivable subject, however inherently local; would obliterate all the limitations of power imposed by the constitution, and would destroy the authority of the states as to all conceivable matters which, from the beginning, have been, and must continue to be, under their control so long as the constitution endures."

We have a national government for national affairs, and state governments for state affairs. Congress cannot regulate or legislate with respect to the latter. They are under the exclusive control of the respective states, and hence it follows that the act of congress requiring railroads engaged in interstate commerce to equip its cars with automatic couplers cannot be extended to the cars of such companies when employed only in the carriage of commerce between points in a state.

At this point it is appropriate to notice that the instruction above referred to is faulty, if not erroneous, in failing to advise the jury that all testimony bearing on the subject of defendant being engaged in interstate commerce was withdrawn from their consideration. It is also appropriate to now call atten-

tion to instruction No. 6, given by the court. As already determined, the alleged defective condition of the locomotive was eliminated by the testimony in the case. Plaintiff does not claim in his testimony that any defects in the locomotive caused or contributed to his injury. He does not claim in his testimony that any unnecessary force exerted by it, or irregular or unsteady movement of the engine, caused the draw-bars and draw-heads to turn down. On the contrary, he attributes but two causes for this result, i. e., the nuts on the draw-bars being loose, or the link not entering the draw-head. Notwithstanding this state of the testimony, the court, in effect, advised the jury by the instruction mentioned, that if the evidence disclosed that the engine was defective, and that plaintiff was injured by reason of such defects through no fault or negligence of his own, then the defendant would be liable to respond in damages for his injuries. True, the complaint alleged that the locomotive was defective, but the evidence established that it did not contribute to plaintiff's injury, or at least there is no evidence that it did; and it was, therefore, error to submit to the jury any question with respect to plaintiff's injuries having been caused by the defective condition of the locomotive. Issues made by the pleadings which the testimony eliminates from the case, or which there is no testimony to establish, should not be submitted to the jury.

The witness Joe Weller was an inspector in the employ of the defendant company at its Durango yards. His duties were to inspect cars for the purpose of ascertaining whether or not they were in a proper state of repair. Over the objection of the defendant, testimony was permitted to be introduced by plaintiff tending to prove that he neglected his duties, and was in the habit of using intoxicating

liquors to excess. If this testimony was competent for any purpose, it was to establish negligence on the part of the defendant by employing one to inspect its cars who did not properly discharge his duties, or whose habits were such that he would neglect such duties. But there was no testimony that the cars between which plaintiff was injured had ever been in the Durango yards, or had been inspected by Weller, or had ever come under his supervision. In an action for negligence the general rule is that evidence of other independent and disconnected acts of negligence which could not have contributed to the plaintiff's injuries, is not admissible to establish the negligence charged.—*Pueblo Building Co. v. Klein*, 5 Colo. App. 348; 21 Enc. of Law 518.

The case at bar falls within this general rule. The only material issue involved was whether the defendant had been negligent with respect to the cars between which plaintiff was injured, in failing to have the draw-heads and draw-bars properly inspected and kept in repair, and evidence tending to prove that in these respects it was negligent in regard to other cars, at other times and places, was not admissible to establish the negligence in issue.

Numerous errors, based upon the instructions given and refused are argued by counsel for the defendant, which we do not deem it necessary to consider further than to suggest that instructions should be predicated upon the pleadings and the evidence. None should be given on issues not made by the pleadings, neither should the court instruct on issues between the parties so presented which the evidence has eliminated, or upon which none was offered. Instruction No. 10, given by the court, furnishes an example of the violation of this rule. By this instruction the jury were advised that if they found for the plaintiff they could include in their verdict the

amount of "all expenses by way of reasonable outlay for physicians and nurses that he may have paid or become liable to pay on account of the alleged injuries"; and yet there is not a particle of evidence that he incurred any such expenses, either past or prospective. On the contrary, it appears that his injury was treated free at the hospital maintained by the defendant for its employees.

In the case at bar, the instructions are twenty-nine in number, and embrace upwards of twenty pages of the printed abstract. At the conclusion of the testimony the issues which it was necessary to submit to the jury were neither so numerous nor so complicated that the giving of such elaborate and lengthy instructions was necessary. The purpose of instructions is to enlighten the jury. If they are unnecessarily voluminous, this end is not attained. They should direct the attention of the jury to the specific issues which it is their province to determine, and embrace only the statements of the law by which the evidence on these issues is to be examined and applied. Generally, those serving upon juries are not accustomed to the duties devolving upon them, and are likely to be confused by the conflicting evidence and the arguments of counsel; and hence, it is extremely important that, in order to aid them in discharging their duties intelligently, the issues of fact which they are to determine should be made plain, and the rules of law applicable to such issues succinctly stated. That these suggestions are not more frequently followed by our trial courts may, to some extent, be attributed to the zeal and anxiety of counsel to get before a jury instructions upon every conceivable phase of the case; so that often, no doubt, trial judges, for fear of committing reversible error by refusing instructions offered, are prompted to instruct to an unnecessary length, and advise the jury

with respect to legal propositions which, though they may be correct, do not really enlighten or aid the jury in the discharge of its functions.

Inasmuch as the judgment must be reversed and the cause remanded for a new trial, there is one further matter to which attention will be directed. In case plaintiff should be adjudged entitled to recover from the defendant, the amount of his recovery will not be affected by whether he is unmarried, married, or has a large family. Neither of these facts, whatever they may be, would enhance or diminish his damages. Any testimony on either of these subjects would be incompetent.—*Penn. Co. v. Roy,* 102 U. S. 451; *U. P. R. Co. v. Hammerlund,* 79 Pac. (Kan.) 152; *St. L., I. M. & S. Ry. Co. v. Adams,* 85 S. W. (Ark.) 768; *L. & N. R. Co. v. Collinsworth,* 33 Southern (Fla.) 513.

The judgment of the district court is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

CHIEF JUSTICE STEELE and Mr. JUSTICE MAXWELL concur.