[No. 5460.]
[No. 3130 C. A.]

## FELT v. THE DENVER & RIO. GRANDE RAILROAD COMPANY.

1. **Exceptions—Bill of Exceptions—When Necessary—**Where defendant excepts to the direction of a verdict against him it is not required that he except to the judgment.—(251)

2. **Railroads—Interstate Commerce—Safety Appliance Act—**Plaintiff's intestate was crushed, while attempting, at the station of Florence, to couple two cars upon defendant's railroad. One of these cars had come into the state from New Mexico, loaded with lumber billed to Florence, and there been unloaded, and ordered to Salida, another station on defendant's railroad, there to be held under general orders, to be used wherever the traffic required. Held that inasmuch as when the car started upon its journey it was being employed in interstate commerce and had become impressed with this character, so that defendant was under duty to equip it with the appliances prescribed by the act of congress, as its journey was not yet completed, and no order had been made by the officers of defendant setting it apart to intrastate traffic, or taking it out of the category to which it had so previously been assigned, it retained that character, and not being equipped as required by the statutes, the defendant was liable.—(251-255)

3. **Cases Overruled, Distinguished or Explained—**The opinion in Rio Grande Co. v. Campbell, 44 Colo. 1, so far as it declares that a car not actually loaded with articles destined to some point outside the state is not within the safety appliance act, overruled.—(254)

Appeal from Pueblo District Court—Hon. J. E. RIZER, Judge.

Messrs. COULTER & GARWOOD, Mr. O. E. GARWOOD, and Mr. JOHN A. RUSH, for appellant.

Messrs. DEVINE & DUBBS, Mr. E. N. CLARK, and Mr. RICHARD PEETE, for appellee.

Per Curiam.—From the admissions in the pleadings and from the testimony, it appears that Charles R. Felt, aged about twenty-five years, the son of the plaintiffs, while attempting to couple cars in the pursuit of his employment as a brakeman of the defendant, received injuries causing his death in the month of February, 1902; that the defendant is a common carrier and was engaged, at the time of the injury, in the business of carrying interstate traffic for hire over its narrow gauge line extending from Colorado into the territory of New Mexico; that the cars between which Felt was caught and crushed were narrow gauge cars; that neither of the cars was equipped with automatic couplers, but both were equipped with link and pin couplers; that car No. 6918, one of the cars between which Felt was caught and crushed, came into the state from the terrritory of New Mexico loaded with lumber billed for Florence; that the lumber had been unloaded, and that the car was being held under orders at Florence awaiting a train to carry it to Salida, the distributing point for cars of that division, and at the time Felt was injured, he was attempting to couple this car into a train bound for Salida, where the car was to be held under general orders to be used whenever needed in the general traffic of the company over the narrow gauge line.

The complaint contains two causes of action.

In the first, negligence in not complying with the Federal Safety Appliance Act is charged—in the

second, recovery is sought upon the liability of the defendant at common law.

A general demurrer to the second cause of action having been sustained, the cause was tried upon the first cause of action.

At the close of the plaintiffs' case, the court directed a verdict in favor of the defendant, holding that neither of the cars of the defendant, between which the son of the plaintiff was crushed, was at the time of the injury, under the control of congress, and judgment of dismissal followed.

The plaintiff objected to the court directing a verdict, excepted to the ruling granting that motion, and excepted to the verdict directed. From the judgment the plaintiffs appealed to the court of appeals.

It was not necessary to except to the judgment. By excepting to the ruling on the motion to direct the verdict, the proper exception having been preserved by the bill, we may consider the evidence for the purpose of determining whether the motion should or should not have been granted. And we are of the opinion that the motion should not have been granted and we must reverse the judgment for that reason.

The Safety Appliance Act was the tardy response of congress to the repeated requests of the president for action. Its purpose is to promote the safety of employees and travelers upon railroads, by compelling common carriers engaged in interstate commerce to equip their vehicles with certain safety appliances, and we shall assume that congress intended, in the exercise of its power, to regulate commerce among the states, to exercise its broadest power in respect to the subject of this enactment. If, therefore, the cars, or either of them, between which the son of the plaintiffs was crushed, belonged,

at the time of the injury, to a class of cars that was within the control of congress, then the court wrongly directed the verdict. When the car started on its journey to Colorado, if not before, certainly then, the company violated the act of congress in not equipping it with automatic couplers. The duty of thus equipping the cars having once rested upon the company, it devolved upon the company to show that something transpired to relieve it of that duty. It is said that the duty ceased when the car was unloaded at Florence; that at that time the car had ended its interstate journey and was under orders to be not returned to New Mexico, but to be sent to Salida. There is nothing in the order of the officers of the company which divested this car of the character of a car used in interstate commerce. The lumber being hauled had reached its destination and, when it was delivered to the consignee and mingled with the general property of the state, it ceased to be under the control of congress; but the car itself had not reached its destination, its journey was not ended, the directions were to send it on to Salida and to not return it to New Mexico.

In *Johnson v. Southern Pac.,* 196 U. S. 1, Chief Justice Fuller said:

"Besides, whether cars are empty or loaded, the danger to employees is practically the same, and we agree with the observation of District Judge Shiras in *Voelker v. Chicago M. & St. P. R. Co.,* 116 Fed. Rep., p. 867, that 'it cannot be true that on the eastern trip the provisions of the Act of Congress would be binding upon the company, because the cars were loaded, but would not be binding upon the return trip, because the cars are empty.'" Hence, it is not necessary, in actions of this character, to allege or prove that a car is actually loaded with interstate traffic. The law requires that it be

equipped with automatic couplers at all times until it reaches its destination as fixed by the order of the company at the time it starts on its interstate journey.

This car was sent to Salida to be used in conveying interstate or intrastate traffic, as the demands of the company required. It was not set apart as a car to be used in intrastate traffic solely, but it was held at Salida ready ready to carry articles to points outside the state, if required, and was so intended to be used whenever needed.

It was held in the case of *U. S. v. St. Louis I. M. & S. R. Company,* reported in 154 Fed., p. 516, that such a car is being used in interstate commerce, within the meaning of the act of congress. When the car was once used in interstate traffic it became impressed with the character of a car used in moving interstate traffic and it so continued until the company took some action to change its character. The company owns an interstate highway. It is regularly engaged in moving traffic over this highway, and a car that has been used and that stands ready for use upon this highway whenever required, may well be said to be a car regularly used in moving interstate traffic. The trains of the company and all the vehicles thereof that travel this interstate highway on an interstate journey are required to be equipped with safety appliances and this, whether hauling freight or empty, or whether engaged in hauling articles destined to points within or without the state.

The car No. 6918, having been once used in actually moving interstate traffic, became impressed with that character, and as it was held in the company's yards at Salida to be sent upon an interstate trip whenever required, and as the record does not show that the car was segregated from the class—

*i. e.,* cars used in moving interstate traffic—in which it was placed by the company, it was, at the time of the injury, a car used in moving interstate traffic within the meaning of the act of congress.

Counsel mainly rely upon the decision in the case of *The Rio Grande Southern Railroad Company v. Campbell,* reported in 44 Colo. 1, as supporting the ruling of the court in directing a verdict. The judgment in that case was reversed because of the error of the court in receiving evidence prejudicial to the defendant.

The facts in that case are not at all like those in this, and that case should not control this. The testimony showed that the company was operating a railroad lying wholly within the state, and that it "frequently received from, and delivered to, connecting lines passengers and freight which had come from, or were destined to, points without the state." There was no showing that any car in the train was loaded with interstate traffic, or that the cars or any of them ever had been so engaged, and we hold now that the bare statement that a road has frequently hauled interstate traffic is not sufficient in a case of this character to hold the company amenable to the federal statute. In that case it was said "before he would be entitled to recover by virtue of the provisions of the Act of Congress, * * * it was encumbent upon him to show that cars 1050 and 1925 were loaded with articles destined to some point outside the state." But upon reflection, in view of the strong additional light thrown upon the decision by the recent federal decisions, we are constrained to overrule the case in so far as it may be construed as holding that a car, unless actually loaded with articles, destined to some point outside the state, is not under the control of congress. We therefore hold that the car No. 6918, was at the time of the

injury mentioned in the complaint, under the control of congress and that the duty of equipping it with an automatic coupler devolved upon the defendant —because at the time of the injury, the car had not concluded its interstate journey, its destination being Salida; also because at the time of the injury, the car was regularly engaged in moving interstate traffic within the meaning of the act of congress.

We find support for our judgment in the following cases: *Johnson v. Southern Pac. R. Co.*, 196 U. S. 1; *U. S. v. St. L. I. M. & S. R. Co.*, 154 Fed. 516; *Belt Ry. Co. v. U. S.*, 168 Fed. 542; *Voelker v. C. M. & St. P. Ry. Co.*, 116 Fed. 867; *U. S. v. Southern Ry. Co.*, 164 Fed. 347; *Wabash R. Co. v. U. S.*, 168 Fed. 1.

The judgment is therefore reversed and remanded for a new trial with leave to the parties to amend their pleadings as they may be advised.

*Reversed and remanded.*

Decision *en banc.*

Mr. Justice Campbell and Mr. Justice Gabbert dissent.

Rehearing denied July 5, A. D. 1910.

---

Mr. Justice Campbell dissenting:

It will be observed from the foregoing opinion that the question for decision involves a construction of an act of congress. While the facts of this case are not the same as those in *Rio Grande Southern Railroad Company v. Campbell*, 44 Colo. 1, the same statute governs each case, the same rules of construction are to be applied, and, if the doctrine of that case is followed, this judgment must be affirmed. I do not understand that this court was laying down a general rule when it is supposed to have said in the *Campbell case,* cars must be actually loaded with articles destined from a point in one state to a point

in another state, before congress, under the interstate commerce clause, can require them to be equipped with automatic couplers. The observation referred to must be taken in connection with the facts of that particular case. The cars in question were loaded, but were not destined to points outside this state. But some of the evidence there relied on as bringing the case within the purview of the act was that the railroad company had frequently received from, and delivered to, connecting lines interstate freight and passengers. At all events, the *Campbell case*, unless now overruled, is, in my judgment, as a reading of the opinion will disclose, clearly authority for affirming the judgment in this case, without reference to, and aside from, the language therein used, to which the majority opinion takes exception. It should not be overruled merely because some subordinate federal court may have made a decision inconsistent with it. The fact is, as the dissenting opinion of Justice Gabbert fully shows, that since the *Campbell case* was decided some of the inferior federal courts have not been in accord in their construction of that feature of the act which is now before us. A state court of last resort, which has once adopted a certain construction of an act of congress, as to which the inferior federal courts, whose decisions are not binding on it, are themselves in conflict, should, as a rule, abide by its own decision, until the supreme court of the United States has otherwise authoritatively declared. It is probable that some of these federal decisions, to which the foregoing opinion refers, are now, or will soon be, before the supreme court of the United States for review. If that tribunal should give to the statute a construction different from that put upon it by our first decision on the subject, a judgment of reversal here might be right; but if the same construction

should be given, then, of course, a reversal here would be wrong. In the circumstances here disclosed it certainly comports with good practice for this court to stand by its own previous decision, or, at least, for a reasonable time to postpone further consideration of the cause, till a controlling decision is had by the court of last resort, to which all subordinate courts, federal and state, must conform. For the foregoing reasons, and without expressing an opinion as to the proper construction to be given to the statute, I am constrained to dissent from the conclusion of the majority.

Mr. JUSTICE GABBERT dissenting:

I am unable to understand upon what tenable ground, when considered in connection with the facts, the decision of the court is based. It is stated that if the cars between which deceased was injured, or either of them, were within the control of congress at the time of the injury, then the direction of the trial court was error. This proposition is sound, but the facts show that neither of the cars was employed in interstate commerce when the injury occurred. It is said that hauling the flat car from Brazos, New Mexico, to Florence, Colorado, unequipped as the federal Safety Appliance Act requires, was a violation of that law, and it devolved upon the company to show that it was relieved of this duty. This proposition is unsound, because it requires the defendant to disprove a fact which it was necessary for the plaintiffs to prove, namely, that the cars between which deceased was injured, or one of them, was employed in interstate traffic at the time of his injury. A defendant is never required to disprove a case until one is made against him; but if we accept the proposition, then plaintiffs failed

(17)

to make a case, because the testimony clearly shows that the movement of the cars between which deceased was injured was for purely local purposes at the time of his injury. It is said that the order of the officers of the company, to forward the car from Florence to Salida, did not divest it of the character of a car used in interstate commerce. If an order to move a car from one point in the state to another in the state after it has reached its destination and has been unloaded does not make the movement under such order, in such circumstances, purely local, it is impossible to state one which would be. Beside, the car had been employed in local use for several days after it was unloaded.

It is said the car had not reached its destination; that its journey was not ended; that the directions were to send it to Salida. That is a statement not justified by the facts, or is so inadvertently stated as to be misleading. The car was billed to Florence. That was its destination. Getting it ready to transport to Salida was not in pursuance of any order made at the time it was billed to Florence, but in pursuance of a general order to forward empty cars to Salida unless otherwise specially ordered. Where it would be sent after reaching Florence depended entirely upon the direction of the company after it reached that point. Its movements in these circumstances, under the general order, was as much local as it would have been had a specific order been made to send it to Salida, or had an order been issued after it was unloaded to return it to Pueblo, or forward it to Canon City. Under the facts the quotation from the 196 U. S. has not the slightest application. The flat car was not being prepared to be returned to Brazos, New Mexico.

It is also said, in substance, that the car was sent to Salida to be used in such traffic as the needs

of the company required, and was not set apart to be used in intrastate traffic solely, but was held ready to be used for interstate traffic when required, and was so intended to be used when needed. It is said on the authority of *U. S. v. St. L., I. M. & S. R. Co.*, 154 Fed. 516, that such a car is being used in interstate commerce within the meaning of the act. The facts in that case are so totally different from the one at bar, as will be noticed later, that it is no authority whatever in support of the proposition announced. The flat car was no more intended to be used for interstate traffic when it was being made ready to send to Salida than for intrastate traffic, but was to be thereafter used as occasion might require. In these circumstances it was not set apart for any special use. To demonstrate how far the proposition under consideration is wide of the mark, and that it furnishes no test by which to determine the character of traffic in which the car was employed, at the time deceased was injured, a simple illustration will make clear. Suppose the general assembly of the state of Colorado should pass an act prescribing the equipment of cars when employed in intrastate traffic, and the question should arise whether the movement of a car was intrastate or interstate. If the former, the state act would apply; if the latter, the act of congress would control. Would the mere fact that the car was being made ready to be moved to a point where it would be used in such character of traffic as the demands of the company might require furnish the test by which to determine in what character of traffic it was then employed?

It is also stated, in substance, that the flat car, having once been used in interstate traffic, was impressed with the character of a car used in moving interstate commerce, and was continued until the

company took some action to change its character. This proposition is unsound, but accept it as correct, the facts make a case without its application. The journey of the car ended at Florence; it was thereafter employed for local purposes only. This, and the action of the company in preparing it to be sent to Salida was affirmative action upon its part which changed the use in which it was theretofore employed.

Next, it is said: "The Company owns an interstate highway; it is regularly engaged in moving traffic over this highway; and a car that has been used and stands ready for use upon this highway whenever required may well be said to be a car regularly used in moving interstate traffic." What about cars that stand ready for use in intrastate traffic? Is it not equally logical in such circumstances to say that its cars are regularly used in moving intrastate traffic? If this is the test, how can the two classes of cars be segregated? How can it be determined in case the question should arise with respect to whether the law of the state, if we had one prescribing the equipment of cars, or the federal act on the subject should apply? It would be impossible under the proposition announced. The one test would be the character of use in which the car was employed at a specific time. Unless such act is the test, it would be impossible for the state to regulate the equipment of cars when employed in intrastate traffic, and it is only by such test that the applicability of the federal act can be determined.

Finally, it is said, after attempting to distinguish the *Campbell case* from the one at bar: "We now hold that the bare statement that a road has frequently hauled interstate traffic is not sufficient in a case of this character to hold the company amenable to the federal statute." I agree with that holding,

but why is it correct? For the simple reason that under the act a railroad company is only amenable to its provisions when engaged in interstate traffic. The proposition of law above announced completely refutes every other in the opinion, except the first, upon which the conclusion is based that the federal act is applicable to the case at bar. It places the burden of proving a violation of the act where it belongs, *i. e.*, upon the plaintiff. It makes it necessary for a plaintiff, when suing for injuries sustained between cars not equipped as the act requires, to show that one or both were then employed in interstate commerce. It renders the previous use of a car with respect to the character of commerce in which it was engaged wholly immaterial. It completely refutes as unsound the proposition that because a car may, in the future, be employed in interstate traffic, "it may well be said to be a car regularly used in moving interstate traffic," and demonstrates that the statement to the effect that a car once having been used in interstate traffic is impressed with that character until some affirmative action of the company changes it, is unsound and untenable. In short, it makes the test as applicable to the case at bar the character of traffic in which the cars were being used between which deceased was injured at the time of his injury, which the facts show was intrastate.

I am unable to agree with the conclusion of the majority, and for the purpose of showing that it is wrong, will state the undisputed facts as disclosed by the record, from which it will appear that according to the first proposition of the majority opinion as above noticed, the judgment of the district court should be affirmed; and that the conclusion of the majority is based upon deductions of fact directly contrary to the real facts of the case. This, in con-

nection with a general discussion of when the federal
act applies, and when not, will demonstrate, if my
views are correct, that the judgment of the majority
cannot be upheld on any theory. In stating the facts
I preface them with this statement, which the record
fully sustains.

The judgment of the district court should be
affirmed for the. reason that, from the facts when
fully stated, it appears plaintiffs not only failed to
show that either of the cars between which deceased
was injured was employed in interstate traffic at the
time of his injury, but it affirmatively appears that
they were not.

Charles R. Felt, an unmarried son of Eugene S.
and Fannie B. Felt, was employed by the D. & R. G.
R. R. Co. in the capacity of brakeman. In the per-
formance of his duties, he was fatally injured in
attempting to couple cars, and the father and mother
brought suit to recover damages. They based their
right to a recovery upon two counts—the first, upon
the ground that the defendant company was an inter-
state road and engaged in hauling interstate traffic,
and that the cars between which their son was in-
jured, and which he was attempting to couple, were
used in moving interstate traffic and were not
equipped with automatic couplers as required by law.
The purpose of the second count was to charge negli-
gence on the part of the railroad company, at com-
mon law. A general demurrer to the second count
was sustained. On the issues made under the first
count the parties went to trial before a jury. At
the conclusion of the testimony on behalf of plain-
tiffs, the court, on the motion of the defendant, di-
rected a verdict in its favor, which was rendered and
judgment entered accordingly. From this judgment
the plaintiffs appealed to the court of appeals.

I shall only consider the error predicated upon

the ruling of the court in directing a verdict for the defendant, because that is the only question discussed in the majority opinion, and in order to do this, it becomes necessary to consider the facts established by the evidence introduced by plaintiffs for the purpose of establishing their cause of action set up in the first count, in so far as it relates to the claim that the company was liable because its cars were not equipped with automatic couplers. The defendant company is an interstate road engaged in the business of a common carrier, with a narrow gauge line extending into New Mexico from Florence in this state, where deceased was fatally injured, in attempting to couple a box car which was the rear one of a train to a flat car on a siding. Neither of the cars between which the coupling was attempted to be made was equipped with automatic couplers, but both were equipped with what is known as the link and pin couplers. The defendant company has other narrow guage lines which it operates in this state. The cars in question were in no special class with respect to where they should be used, but were in general use as occasion required on the company's narrow guage system. The box car had recently come from Kokomo, in this state, to Florence, loaded with ore, and after being unloaded, was sent to Coal Creek, Colorado, near Florence, and reloaded with coal consigned to Gunnison, in this state. From Coal Creek it was brought to Florence and placed upon a siding with other cars, so that when a westbound narrow guage train came along without full tonnage, it, with other cars on the siding, could be picked up and taken to their respective destinations west. The flat car was empty, and about two weeks prior to the injury of deceased had come from Brazos, New Mexico, loaded with lumber consigned to Florence. Its load was discharged about three days after its

arrival. It was then placed upon a sidetrack so that it might be picked up by a passing train which could haul it, bound for Salida, in this state, in conformity with a standing order that all empty narrow guage cars should be forwarded to that place, unless otherwise specially ordered. At Salida it would be used in moving traffic as the needs of the company might require. It remained upon the sidetrack about four days, when it was taken off and used in and about the company's yards, at Florence, for hauling cinders. It was again placed upon the sidetrack so that it might be taken to Salida. On the day deceased was injured, the box car was being backed on the siding, for the purpose of being coupled to the flat car, the object being to have these cars, in connection with others, lined up on the sidetrack so that a passing train for the west might readily pick up such of them as it could haul. There is no testimony to show from what point the flat car was started when it was sent to Brazos, New Mexico, to be loaded with lumber and consigned to Florence in this state. In short, it appears that this car had been used in interstate traffic, but its journey in this capacity had ended; that it was to be transported from Florence to Salida, where it would be used in such traffic, interstate or intrastate, as occasion might require; that the defendant company is an interstate road; and that, according to the undisputed facts, as stated at the outset, the deceased received injuries which caused his death in attempting to make a coupling between two cars (neither of which was equipped with automatic couplers) consigned to points within the state, the initial starting point of which was also in this state.

The precise question here presented, namely, whether or not under the facts, the defendant company was liable because the cars between which de-

ceased was injured in attempting to make a coupling, were not equipped with automatic couplers, was decided adversely to the contention of counsel for appellants that the company is liable for failure to have the cars so equipped, in *Rio Grande Southern Railroad Company v. Campbell,* 44 Colo. 1, and it should not be necessary to more than briefly refer to that case were it not for the fact that counsel for appellants insist, and the opinion of the majority indicates, that it is distinguishable from, or not applicable to, the case at bar, and further, from the arguments advanced by counsel, and the majority opinion, if sound, it appears the decision in the *Campbell case* was wrong. In short, that case should either be expressly overruled, or it should be held that it is decisive of the present one.

Since the opinion was rendered in the *Campbell case* the personnel of the court has changed to some extent, but the present chief justice took part in, and coincided with it, and now coincides in an opinion the effect of which, when the facts in the case at bar are fully considered, is to overrule it. Our opinions, if they are to carry any weight, or if they can be regarded by the bar of the state as reliable precedents, should not be vacillating. We should adhere to them unless convinced that they are wrong, or until a superior tribunal announces an opinion which demonstrates that we erred. The decision in the *Campbell case* was based upon a construction of an act of congress. The supreme court of the United States has rendered no decision which tends to show that we were mistaken in our construction of the act; on the contrary, its decisions, in principle, unequivocally uphold the construction we gave it, and we should not change our views until the supreme tribunal of the nation has spoken in such a way as to show that we erred in the construction given it.

It is said, in effect, that the *Campbell case* is not applicable because, in the opinion it was said: "the road of defendants is entirely located within the State of Colorado." That was not the point upon which the case was decided. On the contrary, we said: "The question in the case was not whether the defendant *at times* was engaged in interstate commerce, but whether the particular cars between which plaintiff was injured in attempting to couple them were engaged in moving interstate traffic," and having reached the conclusion that the cars between which the plaintiff was injured were not at the time of his injury employed in interstate traffic, we held that the act of congress relating to automatic couplers did not apply.

The opinion in that case is also criticised because it was said that plaintiff was not entitled to recover unless he proved that the cars between which he was injured were loaded with articles destined to some point outside the state. That was said, but the gist of the decision, the point upon which it turned, was, that it was incumbent on plaintiff to show that the cars between which he was injured were employed in interstate traffic, and as they were loaded, it was said, in strict accordance with the facts in that case, that he must prove they were consigned to some point beyond the borders of the state. Unless, then, the fact that the defendant was an interstate road and that the flat car on one occasion had made and completed an interstate trip, brings the case within the Safety Appliance Act, the *Campbell case* is conclusive, and the lower court was right in directing a verdict for the defendant on this score.

It should be borne in mind that the federal constitution is but a grant of power; that congress cannot legislate upon any subject which it is not thereby authorized to regulate, and that the sole power of

congress to pass laws regulating domestic commerce is limited to those regulating commerce between the states; and hence, it has no authority to pass any law regulating intrastate traffic.   Congress clearly recognized this limitation when it passed the Safety Appliance Act (27 U. S. Statutes at Large 531).   By sec. 1 it provides that it shall be unlawful after a specified date "for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic'' not equipped in a specified manner.   Sec. 2 is as follows:   "That on and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line *any car used in moving interstate traffic* not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."   By sec. 4 of the act it is provided that after a specified date "it shall be unlawful for any railroad company to use any car in interstate commerce that is not provided with secure grab-irons or hand-holds in the ends and sides of each car for greater security to men in coupling and uncoupling cars."   Sec. 5 of the act provides that after the same date "no cars, either loaded or unloaded, shall be used in interstate traffic which do not comply with the standard above provided for."

It will be observed that it is not the character of the road with respect to its being interstate or intrastate, but the character of the car with respect to the traffic in which it is employed that is covered and mentioned in the act, and that it does not embrace a car which has been or may be used, but one then actually in use in interstate traffic.   In other words, a common carrier by railroad is inhibited from hauling or using any car when employed in interstate

traffic not equipped as the act provides.  The purpose of the act is two-fold:  (1) It is confined to a regulation of interstate traffic, which is the extent of the authority conferred upon congress to regulate commerce among the states; and (2) by designating that vehicles when employed in interstate traffic on railroads should be equipped with certain appliances, it covered both intrastate and interstate roads.  It is apparent, therefore, that congress kept well within the limitations imposed upon it by the constitution, and that the purpose of the act was to regulate the equipment of cars when employed in interstate traffic, without regard to the character of the road over which they were moving, and not the road itself, because it makes no distinction between an interstate and intrastate road as such, but is simply and solely directed, so far as it relates to the equipment of cars, to cars when employed in interstate traffic.

And so, in the case at bar, it is not material that the flat car had been employed in interstate traffic, but the crucial question is, were the cars between which deceased was injured, or either of them, so employed when he attempted to couple them?  This question must unhesitatingly be answered in the negative.  The box car, so far as the record discloses, had never been used in interstate traffic, but that is of no particular moment.  It was loaded at a point in this state and consigned to one in the state.  The flat car had been employed in interstate traffic, but when it reached Florence, the place to which the lumber with which it was loaded was consigned, and was unloaded and placed upon a sidetrack, from thence to be taken and again used in moving such traffic as the officials of the company might direct, its employment in interstate traffic was ended.  Thereafter the character of traffic in which it might be employed depended upon its use and ultimate desti-

nation when attached, or being made ready to attach, to a train. After being placed on the sidetrack it was employed at different times in hauling cinders in and about the company's yard at Florence, a purely local use. Again, it was placed on a sidetrack, and when the deceased attempted to couple it to the box car, it was for the purpose of having it taken to Salida as soon as convenient, from whence it would be utilized as occasion might require. The fact that from this point, i. e., Salida, it might be used in moving interstate traffic, or that it might be the "home of the car," is of no moment. The question of fact from which to ascertain the capacity in which it was employed with respect to traffic, is, what was the initial point from which it was to be started on its journey, and what was its ultimate destination when deceased attempted to couple it to the box car? From this the character of its use at that particular time must be determined. It does not appear from what point it started when sent to Brazos, New Mexico, to be loaded with lumber consigned to Florence, but that is not material. Its employment in interstate commerce ceased at the latter point and when thereafter it was sought to couple it to cars for the purpose of hauling it to Salida later, it was no more employed in interstate traffic than it was when used to haul cinders in the company's yard at Florence. A future possible use in moving interstate traffic after it reached Salida would not render the defendant company liable for failure to equip it with automatic couplers; but the criterion is, as stated, in what capacity was it employed at the very time when deceased attempted to couple it to the box car consigned to Gunnison. A conjecture as to a possible future use of a car, or proof of a past use, cannot supply the place of an essential present fact. Under the facts of this case, both cars were clearly employed

for local purposes at the very moment when deceased was injured, and therefore the act of congress relating to safety appliances is not applicable because that act cannot apply to cars when employed in intrastate, or local, traffic. That such is the rule, and that under the facts the federal Safety Appliance Act is not applicable, and therefore no liability attached to the company for failure to have the cars in question or either of them equipped with automatic couplers, is a result which cannot be escaped, when we again consider the limit imposed upon congress by the federal constitution. Under our system of government we have dual sovereignties—national and state —each of which, within its sphere, is supreme. That is to say, we have a national government for national affairs, and state governments for state affairs. Congress cannot regulate or legislate with respect to the latter. They are under the exclusive control of the respective states, and should congress undertake to legislate with respect to matters within the exclusive control of the states, such legislation would be unconstitutional. From the facts of this case, the conclusion of the majority, that the Safety Appliance Act is applicable, if correct, must result, as will appear later, in reviewing the decision of the supreme court in the *Employers' Liability cases,* in the Safety Appliance Act being held obnoxious to the federal constitution. An act of a legislative body will never be so construed as to render it invalid if, by any reasonable interpretation of which it is susceptible, it can be so construed as to render it valid. We have no more right to violate that fundamental law by extending the operation of the act beyond its legitimate scope than congress has to pass an act which, by reason of its scope, would undertake to regulate state affairs.

I, therefore, conclude, that the act of congress

requiring railroads engaged in interstate commerce to equip their cars with automatic couplers, does not extend to the cars of such companies when employed in intrastate traffic, but as the cars between which deceased was injured were then employed in purely local traffic, the judgment of the district court was right. The following cases cited in the *Campbell case* fully support this conclusion: *Winkler v. Phila. & R. Ry. Co.*, 53 Atl. 90; *Johnson v. Southern Pac. R. Co.*, 117 Fed. 462; *Rosney v. Erie R. Co.*, 135 Fed. 311.

In the 53 Atl. case (Del.), the issue was whether the car and locomotive which plaintiff was attempting to couple when injured were equipped with automatic couplers, and were then employed in moving interstate traffic. The court held that the burden of proof was on the plaintiff to show that such car and locomotive were then employed in moving interstate traffic, and were not equipped with couplers as required by the act of congress, and further held that if the car and locomotive were then employed in moving local commerce only, the act did not apply. These rulings were affirmed in 56 Atl. 112.

In the *Rosney* case it was held that the federal Safety Appliance Act did not apply in an action for injuries to a fireman from collision in a railroad yard where there was no proof that the engine and cars in collision were used in interstate commerce. Certainly, it cannot apply when, as in the case at bar, the undisputed proof is that neither of the cars between which the deceased was killed, was a vehicle employed in interstate traffic, but both were only employed at the time of his injury in intrastate traffic.

But I need not take time to cite or discuss the decisions bearing on the questions involved by courts of inferior authority to the supreme court of the

United States, for that august tribunal has determined when and why the act applies, and when and why it does not. Its decisions construing the act of congress relating to the authority of the latter over interstate commerce are conclusive upon us, and we have but to follow and apply them. Besides, they are supported by logic and reasons which are unanswerable. The leading case bearing directly on the subject is *Johnson v. Southern Pacific Ry. Co.,* 196 U. S. 1. That case reached the supreme court of the United States on error to the circuit court of appeals for the eighth circuit, and involved the application of the Safety Appliance Act to the following facts:

A dining car was part of the regular equipment of a passenger train which the railroad company operated between San Francisco, California, and Ogden, Utah. Ordinarily, the dining car in trains running east was dropped at Ogden, at which point it was attached to the train of the defendant going west. The day the plaintiff, Johnson, was injured, the eastbound train was so late that it was not practicable to get the car into Ogden in time to attach it to the next westbound train, and it was left on a side-track at Promontory, west of Ogden, to be picked up by the westbound train when it arrived. While it was standing on the side track at Promontory the conductor of a freight train was directed to take it to a turn-table, turn it, and place it back upon the sidetrack, so it would be ready to return to San Francisco. The conductor instructed his crew to carry out this order. Johnson was the head brakeman, and undertook to couple the engine to the dining car. The freight train and car were each equipped with automatic couplers, but being of different patterns, would not couple automatically with each other, and Johnson undertook to make the coupling

by means of a link and pin, and in doing so, was injured. He brought suit to recover damages, and in so far as material to the present case, the circuit court held at the time Johnson undertook to make the coupling the dining car was not employed in interstate commerce, and therefore, the act of congress did not apply. The conclusion that the car was not employed in interstate traffic was reversed by the supreme court of the United States, the holding of that tribunal being that a dining car regularly engaged in interstate traffic does not cease to be so when waiting for a train to make the next trip. In the opinion of Judge Sanborn, for the circuit court of appeals, he said (471):

"It is by virtue of the power granted to congress to 'regulate commerce among the states,' and by virtue of that authority alone, that this statute was enacted, and has efficacy. Congress had neither the authority nor the purpose to interfere with or to touch by this Act anything except commerce among the states. * * * The power of Congress over this subject was limited to the regulation of commerce among the states. It intended to exercise that power, but not to transgress its bounds. It prohibited the hauling of cars used in moving interstate traffic, unless equipped as the Act directs. * * * But vacant cars which are not and may never be so used, cannot be held to come within the fair import of the terms of this law, either because their owner intends to use them for that purpose, at some future time, or because they have been, or will be so used."

These views were not held erroneous by the supreme court of the United States in reviewing the case. The difference between the latter and the circuit court of appeals was one of fact; that is to say, from the facts, the supreme court determined that the dining car at the time Johnson was injured was

(18)

engaged in interstate traffic, as clearly appears from the following quotation from the opinion (22):

"Confessedly, this dining car was under the control of Congress while in the act of making its interstate journey, and in our judgment it was equally so when waiting for the train to be made up for the next trip. It was being regularly used in the movement of interstate traffic, and so within the law."

So it is apparent that the liability of the Southern Pacific Company for failure to have the car and locomotive equipped with automatic couplers which would couple with each other by impact, was based entirely upon the ground that the dining car, when Johnson undertook to couple it to the engine, was then employed in interstate traffic, and not because it had been or might be in the future, nor because the defendant was an interstate railroad.

This ruling necessarily and unquestionably sustains the conclusion that the act does not extend to a car when employed in intrastate traffic only. The case, however, which most clearly defines the line beyond which congress may not go in legislating on the subject of commerce between the states, and demonstrates beyond question that by virtue of the limitations imposed by the federal constitution, it can exercise no authority whatever over intrastate traffic, and hence establishes that the Safety Appliance Act does not apply to traffic of that character, is the one entitled *The Employers' Liability Cases,* referred to in the *Campbell case,* and reported in 207 U. S. 463. In these cases the court had under consideration the constitutionality of the act of congress of 1906 relating to the liability of common carriers engaged in commerce between the states for injuries sustained by their employees resulting from "the negligence of any of its officers, agents or em-

ployees, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, roadbed, ways or works.'' The act was held unconstitutional because it imposed a liability upon a common carrier engaged in interstate commerce for injuries sustained by its employees when engaged in operating trains exclusively employed in intrastate commerce. There were several opinions filed. All the justices concurred in the conclusion, that if the act imposed a liability upon a common carrier engaged in interstate commerce for injuries sustained by its employees when engaged in operating trains employed in intrastate commerce, it was unconstitutional, because congress had no power to legislate on that subject, it being one exclusively within the power of the states to legislate upon, but the minority took the view that the act only applied to common carriers when actually engaged in interstate traffic, or that, if it attempted to cover intrastate traffic, so much of the act as did could be eliminated, and it could still stand, in so far as it related to interstate commerce.

It is important to observe that the difference between the members of the court arose entirely over the construction of the act, and that all agreed congress could not interfere with a common carrier when engaged in intrastate traffic. The following excerpts from the opinions clearly show that this was the unanimous opinion of the court, and therefore, the Safety Appliance Act could not be upheld, to which one of the justices calls attention, except for the fact that it does not extend to intrastate traffic. The important question involved was, whether or not the act embraced interstate and intrastate commerce. Speaking to this point, Mr. Justice White said (497):

"From the first section it is certain that the act extends to every individual or corporation who may

engage in interstate commerce, as a common carrier. Its all-embracing words leave no room for any other conclusion. * * * From this it follows that the statute deals with all the concerns of the individuals or corporations to which it relates, if they engage as common carriers in trade, or commerce between the states, etc., and does not confine itself to the interstate commerce business which may be done by such persons. Stated in another form, the statute is addressed to the individuals or corporations who are engaged in interstate commerce, and is not confined solely to regulating the interstate commerce business which such persons may do—that is, it regulates the persons, because they engage in interstate commerce and does not alone regulate the business of interstate commerce.''

In discussing the contention that because congress has the power to regulate interstate commerce it may exercise it over a common carrier engaged in interstate and intrastate traffic, for the reason that a carrier so engaged submits all his business concerns to the regulating power of congress, the learned justice said (502):

''To state the proposition is to refute it. It assumes that because one engages in interstate commerce, he thereby endows congress with power not delegated to it by the constitution, in other words, with the right to legislate concerning matters of purely state concerns. It rests upon the conception that the constitution destroyed that freedom of commerce which it was its purpose to preserve, since it treats the right to engage in interstate commerce as a privilege which cannot be availed of except upon such conditions as Congress may prescribe, even although the conditions would be otherwise beyond the power of Congress. It is apparent that if the contention were well founded, it would extend the

power of Congress to every conceivable subject, however inherently local, would obliterate all the limitations of power imposed by the constitution, and would destroy the authority of the states as to all conceivable matters which from the beginning, have been, and must continue to be, under their control, so long as the constitution endures."

In speaking of the Safety Appliance Act, which it was urged was as broad and comprehensive in its terms as the Liability Act, it was said (503): "It is true that the Act, like the one we are considering, is addressed to every common carrier engaged in interstate commerce, but this direction is followed by provisions expressly *limiting the scope and effect of the Act to interstate commerce,* which are wholly superfluous if the arguments here made concerning the statute before us be sound."

Mr. Justice Day concurred in the opinion. Mr. Justice Peckham concurred specially by stating the following (504):

"I concur in the proposition that as to traffic or other matters within the state, the Act is unconstitutional, and it cannot be separated from that part which is claimed to be valid as relating to interstate commerce. As that is all that is necessary to decide in this case, I place my concurrence upon that part of the opinion which decides it."

The chief justice and Mr. Justice Brewer concurred in this opinion.

Mr. Justice Moody dissented upon the ground that the act only embraced employees actually engaged in interstate commerce, and as I understand his opinion, held that the language of the act was no broader than that employed in the Safety Appliance Act, and if the Employers' Liability Act was unconstitutional because it embraced employees when engaged in intrastate traffic, the Safety Appliance Act

was unconstitutional for the same reason. He fully concurred in the conclusion of the majority, that congress had no power to regulate the internal affairs of a state, as will be seen from the following excerpt from his opinion (508):

"Applying the law under consideration to the conditions as they actually exist, it is said that its words are so general and sweeping as to comprehend within its benefits not only the employees of an interstate carrier engaged in the business of interstate carriage, but also the employees of the same carrier engaged in the business of intrastate carriage which it may, and usually does, conduct. * * * If such be the necessary interpretation of the statute, plainly it exceeds the power of Congress, for Congress certainly has no right to regulate the purely internal commerce of a state."

Mr. Justice Harlan, with whom Mr. Justice McKenna concurred, also dissented. The following excerpt from his opinion, however, demonstrates that these members of the court fully concurred in the view that congress had no authority to regulate the internal affairs of the states (540):

"Mr. Justice McKenna and myself are of the opinion that it was within the power of Congress to prescribe as between an interstate commerce carrier and its employees the rule of liability established by the Act of June 11th, 1906; but we do not concur in the interpretation of that Act as given in the opinion delivered by Mr. Justice White, but think the Act reasonably and properly interpreted applies, and should be interpreted as intended by Congress to apply, only to cases of interstate commerce and to employees who, at the time of the particular wrong or injury complained of, are engaged in such commerce, and not to domestic commerce or commerce complete-

ly internal to the state in which the wrong or injury occurred.''

Mr. Justice Holmes also dissented, but concurred in the view that congress had no authority to regulate intrastate commerce. He said (541):

''I must admit that I think there are strong reasons in favor of the interpretation of the statute adopted by the majority of the court, but as it is possible to read the words in such a way as to save the constitutionality of the Act, I think they should be taken in that narrower sense.''

Certainly, these clear and unequivocal statements made in a case involving directly the authority of congress to pass legislation affecting those engaged in intrastate commerce, not only demonstrates beyond the shadow of a doubt that the Safety Appliance Act only affects interstate commerce, as such, does not, and cannot extend to intrastate traffic, and unmistakably determines that congress has no more authority to subject a common carrier to liability for failure to observe a regulation intended to apply to all cars used on its road, both those used in interstate and those used in intrastate commerce, than it has to subject such carrier to liability to employees for the negligence of co-employees; but completely refutes as unsound and untenable the conclusion announced in the majority opinion, to the effect that because defendant was an interstate road, engaged in interstate traffic, and that the flat car had once been used in moving interstate traffic, it had that character indelibly stamped upon it, until the company set it apart for use in intrastate traffic only. From these excerpts it is clear that the test of the applicability of the act is, as previously stated, what was the character of traffic the cars were employed in between which deceased was injured at the very time of his injury?

It is immaterial, then, that the cars in question may have been, or in the future may be, used in interstate traffic, or that a part of the defendant's business consists in hauling interstate traffic, for the very essence of the right of congress to legislate on the subject of domestic commerce at all consists in the fact that it is empowered by the federal constitution to regulate commerce between the states. Such being the limit imposed upon congress, it follows that an action to recover for an injury as the result of a violation of the Safety Appliance Act cannot be maintained unless the facts are such as to bring the case within the domain over which congress may exercise legislative control. In the case at bar plaintiffs not only failed to show that the cars, or either of them, between which the deceased was injured were, at the time of his injury, then employed in interstate traffic, but it affirmatively appears that they were not.

Of the many cases cited by counsel for appellants, I shall only refer to those cited in the majority opinion.

*Wabash R. Co. v. United States,* and *Elgin, J. & E. Ry. Co. v. United States,* 168 Fed. 1, were actions to recover penalties for violation of the Safety Appliance Act, as prescribed in sec. 6 of the act. With due deference to the learned court deciding these cases, which are disposed of in one opinion, I cannot agree with the conclusion that the act requires a common carrier operating an interstate road to equip its cars when employed in intrastate traffic with automatic couplers. The decision is directly in conflict with the decision of the supreme court of the United States in the *Employers' Liability cases,* for the reason that according to the principle upon which these cases were decided, congress has no more authority to control a railroad when engaged in intra-

state traffic by prescribing the equipment for its cars than it has to prescribe a rule of liability for the negligence of its employees. The decision is based upon a misconception of the ground upon which the decision in the *Employers' Liability cases* was made. In construing the opinion of the supreme court of the United States in those cases it was said (p. 5): "The statute was overthrown only because an inseparable part of it was found to have no necessary or proper relation to the security of interstate transportation." It hardly seems necessary to repeat that the decision was not based upon that ground at all, but solely upon the ground that congress had no right to regulate intrastate commerce, whether carried on over an interstate or an intrastate road, and because the act embraced both classes of traffic it was held unconstitutional.

Finally, the opinion seems to be based, to some extent, at least, upon the theory that congress undertook, by the act in question, to regulate interstate roads. In this respect the purpose of the act and its scope are misconceived, because it does not undertake to prescribe the equipment of any railroad, but prohibits a common carrier from hauling or permitting to be hauled, or used on its line, any car "in interstate traffic" if not equipped as prescribed, thus confining the act to interstate commerce, which, under the constitution, is the only class of domestic commerce which it is empowered to regulate.

Judge Seaman dissented from the judgment upon the ground that congress had no authority over intrastate traffic, and in my opinion, gave the true reason why the Safety Appliance Act does not affect intrastate traffic. He said (p. 11): "The Wabash Company operating its lines for both classes of traffic —in the one instance an interstate movement and the other exclusively intrastate—must be governed

by one or the other authority, according to the nature of the operation. Its duality of obligation is not conflicting, but separable. For the movement of a car for a purpose of intrastate traffic alone, it must observe the state requirements—which include those at common law—and when the car is moved for the purpose of interstate traffic, the operation becomes subject to Congressional regulation.''

The decision in the case of the *United States v. Southern Ry. Co.,* 164 Fed. 347, was by a single district judge, at *nisi prius,* on a demurrer to a complaint. It was an action to recover penalties for a violation of the Safety Appliance Act. One of the counts averred that the violation consisted in hauling a car loaded with coal from Birmingham, Ala., to Selma, in the same state by an interstate road. The demurrer challenged this count because it appeared the car was only in use in intrastate traffic. It was overruled, and according to the syllabus, the court held that under the Safety Appliance Act, a failure to provide cars with safety appliances required by the act, is a violation thereof, when the trains are operated over any portion of an interstate road, even though that portion be from a point within a state to another point within the state, in circumstances from which it appears the traffic was purely local. It appears the judge reached this conclusion upon the ground that congress had authority to regulate the local traffic within a state of an interstate road by virtue of its police power. Without going into a discussion of the case, it is evident that the trial judge did not understand, or inadvertently misapplied, the decisions of the supreme court of the United States, and overlooked the fundamental principle that the power of congress to regulate commerce among the states only authorizes it to legislate on the subject or interstate commerce; that it can only exercise the

powers granted; that all others are reserved to the states, and therefore, intrastate commerce is within the exclusive control of the latter. This decision is directly contrary to the decision of the supreme court of the United States which held the Employers' Liability Act unconstitutional, because it imposed a liability upon a common carrier engaged in interstate commerce for injuries sustained by its employees when operating trains employed in intrastate commerce, which Mr. Justice White, in the course of the opinion, in answer to the contention on the part of the government that a common carrier engaged in interstate commerce submits all its business concerns to the regulating power of congress, stated most emphatically, in substance, could not be tolerated, for the reason that it would extend the authority of congress to every subject, however inherently local, would obliterate all the limitations of power imposed upon congress by the federal constitution, and would destroy the power of the states over matters purely local, which have always been, and must always remain, under the exclusive control of the states, so long as the constitution endures.

An authority of equal dignity to 164 Fed., and which directly refutes the holding of the district judge in that case is *U. S. v. Erie R. Co.*, 166 Fed. 352, where the district judge used the following language:

"It seems to me, notwithstanding the views expressed by Judge Hundley, in *U. S. v. Southern Ry. Co.*, 164 Fed. 347, * * * that the principle on which the *Employers' Liability cases* were settled (207 U. S. 463), is applicable here. Congress may regulate interstate, but not intrastate, commerce. It has no more authority to subject a common carrier to liability for failure to observe a regulation intended to apply to all cars used on its road, both those

used in interstate and those used in intrastate commerce, than it has to subject such carrier to liability for failure to observe a regulation intended to favor all employees on its road. The doctrine that 'one who engages in interstate commerce thereby submits all his business concerns to the regulating power of Congress,' is one, said Mr. Justice White, 'that is refuted by the statement of it.' ''

In *Voelker v. C., M. & St. P. Ry. Co.*, 116 Fed. 867, nothing is said, nor do the facts in that case support any conclusion announced by the majority, which have any pertinency to the questions involved in the case at bar. The same may be said of *Belt Ry. Co. v. U. S.*, 168 Fed. 542. It was there decided that a local railroad, engaged in moving cars consigned to a point outside the state from one road to another, was engaged in interstate traffic. What was said in *U. S. v. St. L., I. M. & S. R. Co.*, 154 Fed. 516, must be considered in connection with the facts. It was an action to recover a penalty for a violation of the Safety Appliance Act. The railroad company had violated the act by hauling empty cars not equipped with automatic couplers from one state to another. The cars had been taken to Memphis, Tennessee, from some point outside the state. They were inspected by a government inspector, who found that they were not lawfully equipped. At the time of inspection they were chained together, placed in a freight train destined to the state of Arkansas, were way-billed to a point in that state, and were thereafter transported to that point by the train of which they formed a part when the inspection was made. I cannot see how, under that state of facts, the statement in the opinion of the majority, to the effect that because the flat car was ready to be used for interstate traffic when required and was so intended

to be used when needed, finds any support from what was said in that case.

If the conclusions of law announced by the majority in so far as they can be said to be based upon the real facts in the case at bar, are sound, the Employers' Liability Act should have been upheld by the supreme court of the United States upon the ground that when a railroad extends into two or more states, or when an intrastate road at times engages in interstate traffic, the authority of congress is supreme, and the authority of the respective states over such roads relating to matters purely local, is completely ousted; and the line which the supreme court has so many times defined as the boundary beyond which congress cannot go in passing legislation affecting internal affairs of a state, is a myth. It is only upon these grounds, when the undisputed facts are considered, although in unmistakable language they have been declared untenable by the highest tribunal of the nation, that the majority opinion can be upheld.